PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

DEMARCUS M. BROWN,
    *Petitioner-Appellant,*

v.

DANIEL BRAXTON, Warden, Red
Onion State Prison,
    *Respondent-Appellee.*

No. 03-6763

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, Senior District Judge.
(CA-02-47-7)

Argued: May 4, 2004

Decided: July 1, 2004

Before WILKINSON, KING, and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Gregory joined.

---

## COUNSEL

**ARGUED:** Charles E. Luftig, Third Year Law Student, Appellate Litigation Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Susan Foster Barr, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Neal L. Walters, Charlottesville, Virginia, for Appellant. Jerry Walter Kilgore, Attorney General of Virginia, Richmond, Virginia, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

DeMarcus M. Brown, an inmate incarcerated at Red Onion State Prison in Pound, Virginia, was found guilty at a prison disciplinary hearing of assaulting a fellow inmate, Johnnie Lee Beavers. The officer in charge of the hearing denied Brown's request to call Beavers as a witness, but allowed Brown to submit Beavers' written statement in lieu of live testimony. Brown claims that his inability to present Beavers as a live witness denied him due process of law, but we disagree. Prison officials have the discretion, indeed the duty, to protect the inmates committed to their care. Among other concerns, prison authorities justifiably feared reprisal against Beavers in the event that his testimony was not as Brown hoped, and they were not constitutionally required to expose Beavers to the threat of a second beating. We therefore affirm the judgment.

I.

The State of Virginia classifies its correctional facilities at six different levels. Level 1 correctional units provide dormitory-style living for minimum-security inmates convicted of relatively minor offenses. By contrast, Level 5 and 6 prisons house maximum-security inmates convicted of much more serious offenses. Red Onion State Prison, where Brown and Beavers are incarcerated, is Virginia's only Level 6 facility. It provides maximum-security celled living for inmates who have severe behavioral problems; who are serving extremely long sentences; or who present escape risks.

On September 9, 2000, Beavers had completed his duties as an inmate recreation worker and was returning to his cell. When Correctional Officer Samie Fleming opened Beavers' cell door, Brown followed Beavers inside. Fleming heard slapping and hollering from inside the cell, so he closed the cell door and reported an emergency on the cell intercom. Lieutenant James Robinson, Sergeants Gregory Deel and Dwight Moore, and several other correctional officers responded immediately to Fleming's call. According to Lieutenant Robinson, he saw Brown and Beavers fighting on the bottom bunk of the cell. When Brown and Beavers ignored repeated orders to stop

fighting, the officers entered the cell and separated the pair. Both Brown and Beavers were then examined by the prison's medical staff.

According to Lieutenant Robinson's Incident Report, signed and dated the day of the fight, the prison nurses who examined Beavers found that his left back tooth had been chipped during the altercation and his left wrist had been cut. Beavers also told the nurses, "I was hit with an adapter." As for Brown, he sustained a bite mark on his right forearm and a few small cuts and abrasions. Brown was later placed in administrative detention, while Lieutenant Kelly Chris investigated the altercation.

On September 18, 2000, Brown was served with a copy of Lieutenant Chris's Disciplinary Offense Report, which stated that Brown was being charged with aggravated assault. Upon being served, Brown requested that Beavers appear as a witness on his behalf. Then on September 22, Beavers submitted to prison officials a written statement that said simply: "At no time did inmate D. Brown assault me with his adapter or in any other way."

On September 25, 2000, Inmate Hearing Officer Brett Edmonds conducted a disciplinary hearing on Brown's assault charge. Lieutenant Chris testified about Fleming's report of the fight, as well as the nurses' report on Beavers' injuries and Beavers' statement to the nurses that he had been hit with an adapter. Chris also testified that during his investigation he had interviewed Beavers. According to Chris, Beavers said that he and Brown had argued prior to the fight, and that later Brown had run into Beavers' cell and attacked Beavers with an adapter wrapped in a sock. As Chris had noted in his Disciplinary Offense Report, an adapter with Brown's name and inmate number was found in Beavers' cell following the fight. Finally, Chris testified that he had also interviewed Brown, who said that he was in Beavers' cell with the permission of Beavers' cellmate to watch television. However, Brown denied making such statements to Chris (and Beavers' cellmate denied knowing Brown, much less giving him permission to watch his television).

Edmonds then gave Brown an opportunity to present evidence in his defense. Brown requested that Beavers be called as a live witness, but Edmonds denied Brown's request. Edmonds then read Beavers'

written statement into the record. Accordingly, Brown argued that he should not be found guilty of assault since Beavers himself denied being assaulted in any way. When Edmonds asked Brown whether he had anything else to present, Brown said no; he presented no other witnesses or arguments.

Edmonds proceeded to find Brown guilty of aggravated assault, sentencing him to the loss of 180 days of good conduct time. According to Edmonds' written findings, (1) Brown had been identified by Officer Fleming as the inmate who had entered Beavers' cell; (2) Beavers had sustained injuries consistent with fighting; (3) Beavers had stated to nurses immediately following the fight that he was attacked with an adapter; (4) Brown's adapter was found in Beavers' cell after the fight; and (5) when Beavers was subsequently interviewed by Lieutenant Chris, Beavers confirmed that Brown had assaulted him with an adapter.

Brown presented a host of claims in a state habeas petition to the Supreme Court of Virginia. That court dismissed his petition on November 8, 2001. Brown then reiterated his claims in a habeas petition filed in the United States District Court for the Western District of Virginia, which also dismissed Brown's petition on March 19, 2003. We issued a certificate of appealability on October 24, 2003 to consider whether Brown's right to due process was violated by Edmonds' refusal to call Beavers as a witness.

## II.

Brown challenges the constitutionality of Virginia Department of Corrections Division Operating Procedure ("DOP") 861.14(B)(1). Brown alleges that Edmonds relied on DOP 861.14(B)(1) in denying his request to call Beavers as a witness. DOP 861.14(B)(1) provides that in all disciplinary hearings for certain types of charged offenses

> [t]he IHO [Inmate Hearing Officer] shall examine each witness' statement for relevance and repetitiveness. A witness' written statement shall not be used in lieu of the witness' testimony at a Disciplinary Hearing, except at Level 5 and 6 institutions and segregation units; the statement from an inmate witness is sufficient. Staff witnesses requested by the

inmate should appear at the Disciplinary Hearing at Level 5 and 6 institutions and in segregation units.

DOP 861.14(B)(1) thus regulates the use of witness testimony in disciplinary hearings, and it draws distinctions based upon the type of institution at which the accused inmate is housed, the type of witness sought by the accused inmate, and the type of testimony to be offered by the witness. Specifically, DOP 861.14(B)(1) allows inmates at all Virginia correctional institutions an unqualified right to call staff witnesses at disciplinary hearings. However, only inmates at Level 1, 2, 3 and 4 facilities are guaranteed the right to call willing fellow inmates as live witnesses. Prisoners at Level 5 and 6 facilities who wish to present testimony from their fellow inmates may be required to submit written statements in lieu of live testimony.

## A.

An analysis of the constitutionality of DOP 861.14(B)(1) must begin with the Supreme Court's seminal case on the due process rights of prisoners, *Wolff v. McDonnell*, 418 U.S. 539 (1974). In *Wolff*, the Supreme Court considered how prison disciplinary hearings must be structured in order to comport with the demands of the Due Process Clause of the Fourteenth Amendment. The Court was clear that inmates retain rights under the Due Process Clause, but that their rights are "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Wolff*, 418 U.S. at 556. Prison disciplinary hearings, unlike criminal prosecutions or parole revocation hearings, "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law. . . ." *Id.* at 561. In many prisons, the inmates can be dangerous to each other, and they are confined to a setting that is often rife with tension between inmates, guards, and prison officials. *Id.* at 561-62. As the Court recognized, "[i]t is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments. . . ." *Id.* at 562.

In defining the balance between inmates' due process interests and prison authorities' penological needs, the *Wolff* Court drew some firm lines. On the one hand, inmates are entitled to advance written notice

of the claimed violation, as well as a written statement concerning the evidence relied upon and the reasons for the disciplinary action taken. *Id.* at 563. On the other hand, inmates are not entitled to confront the witnesses against them, nor are they guaranteed the right to retained or appointed counsel. *Id.* at 567-70; *see also Baxter v. Palmigiano*, 425 U.S. 308, 315-22 (1976) (discussing limited range of inmate rights in prison disciplinary proceedings).

But with regard to an inmate's right to present evidence in his defense, the Court took a more nuanced view. An inmate facing disciplinary proceedings has the qualified right "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. The purpose of the qualification was manifest: "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* Thus after *Wolff*, it was clearly established that prison officials had the discretion to deny witness requests, where legitimate penological interests justified excluding a witness.

*Wolff* did leave open an important question that has divided the circuits: whether prison officials had to consider witness requests on a case-by-case basis, or whether they could formulate regulations designed to deal with such requests categorically. *Compare Ramer v. Kerby*, 936 F.2d 1102, 1104 (10th Cir. 1991) (*Wolff* demands an "individualized determination" whether to grant an inmate's witness request); *King v. Wells*, 760 F.2d 89, 93 (6th Cir. 1985) ("*Wolff* requires that officials make an individualized decision on the facts of each case. . . ."); *Dalton v. Hutto*, 713 F.2d 75, 78 (4th Cir. 1983) (*Wolff* deems "*per se* proscriptions against the calling of certain categories of witnesses" violative of due process); *Bartholomew v. Watson*, 665 F.2d 915, 918 (9th Cir. 1982) (*Wolff* demands "a case-by-case analysis of the potential hazards" of calling a particular witness), *with Whitlock v. Johnson*, 153 F.3d 380, 386-87 (7th Cir. 1998) (recognizing room for generalized rules that exclude certain types of witnesses); *McGuinness v. Dubois*, 75 F.3d 794, 799-800 & n.7 (1st Cir. 1996) (questioning the case-by-case requirement); *Powell v.*

*Coughlin*, 953 F.2d 744, 749 (2d Cir. 1991) (upholding policy against calling prison mental health clinicians in inmates' presence).* However, we need not revisit that debate here, because *Wolff* establishes beyond doubt all that is necessary to resolve this case: hearing officers like Edmonds may decide that legitimate penological interests justify the denial of an individual inmate's witness request, and their decisions are not to be lightly second-guessed by courts far removed from the demands of prison administration.

B.

The parties dispute whether Inmate Hearing Officer Edmonds applied DOP 861.14(B)(1) as a categorical rule against live testimony by inmate witnesses at Level 5 and 6 facilities. However, the district court reviewed the tapes of Brown's disciplinary hearing and found as a factual matter that Edmonds had individually considered Brown's request. In all events, it is clear that Edmonds acted under the authority of the regulation in declining to call Beavers in person. The simple question before us is whether we should defer to his decision. For at least three reasons, we conclude that we must.

1.

Initially, DOP 861.14(B)(1) serves legitimate penological interests. The regulation is designed above all to prevent inmates from forcefully coercing testimony out of their fellow prisoners. Simply put, it protects inmates' safety. "Retaliation is much more than a theoretical possibility" for inmates who are called as witnesses in disciplinary hearings, *Wolff*, 418 U.S. at 562; it is a "very real danger[ ]," *Ponte*

---

*In *Ponte v. Real*, 471 U.S. 491, 496 (1985), the Supreme Court intimated that broader policies designed to deal with witness requests might be constitutionally permissible. Accordingly, in *Ponte*'s wake, there has been a growing recognition that prisons may develop witness request policies for sensible reasons. *See, e.g.*, *Whitlock*, 153 F.3d at 387 (explaining how *Ponte* "allow[ed] for the possibility that some [blanket] policies, if sensitively designed and administered, could be constitutional"); *Powell*, 953 F.2d at 749 (same). In view of the grounds for our decision here, we need not address the continuing viability of our decision in *Dalton* in the face of *Ponte* and its progeny.

*v. Real*, 471 U.S. 491, 495 (1985). As the Supreme Court has recognized, prisoners are "subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner," and they are vulnerable should they elect to violate that code. *Wolff*, 418 U.S. at 562. Certainly inmate witnesses do not always testify under threat of coercion. Yet the broader concern of reprisal necessitates protection for inmate witnesses, especially at prisons like Red Onion that are filled with the State's most hardened criminals. Virginia has rightly sought to diminish the risk to maximum security inmates' safety by allowing them to testify in writing.

The regulation also attempts to reduce the shuffling of inmates inside maximum security prisons. Disciplinary hearings have placed a serious administrative burden on prisons, whose caseloads can require standing disciplinary boards that convene daily to hear hundreds of cases a week. *See, e.g.*, *Whitlock v. Johnson*, 153 F.3d 380, 389 (7th Cir. 1998). In this context, it is truer than ever that "the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Wolff*, 418 U.S. at 566. Again, DOP 861.14(B)(1) quite reasonably attempts to minimize the substantial disruption and administrative burden that would flow from an unrestricted right to live witness testimony.

2.

Secondly, the State has tailored its regulation to meet its penological concerns. The twin dangers of retaliation and disruption are present to some degree whenever inmates are allowed to call their fellow prisoners as witnesses in disciplinary proceedings. Yet the Virginia Department of Corrections has not sought to limit live testimony from all kinds of witnesses, nor has it sought even to limit live testimony from inmate witnesses at all kinds of facilities.

Rather, the State has simply vested prison officials like Edmonds with the discretion to decide whether some relatively few inmates — those inmates held at maximum security facilities — should testify in person or in writing. For while both oral and written testimony present some danger of retaliation and disruption, the face-to-face, con-

frontational nature of oral testimony creates more serious difficulties for prison officials. In sum, the State has tailored its regulation to meet its most pressing needs by placing limits on the live testimony of its most dangerous inmates — those inmates who pose the severest threat to personal and institutional safety. The bounds that prison authorities have placed on live witness testimony thus represent a sensible "mutual accommodation between institutional needs and objectives and the provisions of the Constitution. . . ." *Wolff*, 418 U.S. at 556.

Indeed, it is the moderateness of Virginia's regulation that sets it apart from other witness request policies. For example, in *Dalton v. Hutto*, 713 F.2d 75, 77-78 (4th Cir. 1983), this court invalidated a Virginia prison guideline — in fact, a less artfully crafted predecessor to DOP 861.14(B)(1) — that denied all inmates the right to call any witness who would not appear voluntarily. Pursuant to Guideline No. 861, two corrections officers had refused to testify at prisoner James Dalton's disciplinary hearing as Dalton had requested. *Dalton*, 713 F.2d at 76. The court concluded that for an inmate's due process right to be meaningful, prison officials could not stand idly by while any witness refused to testify for any reason or even no reason at all. *Id.* at 78.

However, the differences between DOP 861.14(B)(1) and the guideline at issue in *Dalton* are stark. Unlike DOP 861.14(B)(1), Guideline No. 861 made no provision for the submission of written statements in lieu of live testimony. Thus Dalton and the prison tribunal were wholly without the benefit of Dalton's desired testimony. *See id.* at 77. Guideline No. 861 also made no attempt to distinguish between inmate, staff, and outside witnesses. In fact, in *Dalton* it was two corrections officers who were refusing to testify — witnesses who would be compelled to testify under DOP 861.14(B)(1), which accords inmates at all Virginia correctional institutions an unqualified right to call staff witnesses at disciplinary hearings.

In short, Dalton's right to call witnesses was essentially eviscerated, which *Wolff* does not permit; but Brown's right to call witnesses was instead qualified, which *Wolff* expressly sanctions. The distinction is crucial, because the majority of regulations invalidated by our sister circuits have been absolute prohibitions on the calling of wit-

nesses or certain categories of witnesses. Those regulations have applied system-wide to all disciplinary hearings, and they have resulted in the loss of testimony altogether. *See, e.g.*, *Whitlock v. Johnson*, 153 F.3d 380, 388 (7th Cir. 1998) (invalidating "policy of denying virtually all requests for live witnesses"); *Mitchell v. Dupnik*, 75 F.3d 517, 525 (9th Cir. 1996) (invalidating "a blanket policy of prohibiting inmates from calling any witnesses under any circumstances to testify at disciplinary hearings"); *Forbes v. Trigg*, 976 F.2d 308, 318 (7th Cir. 1992) (invalidating policy that allowed inmates and staff members to refuse to testify at disciplinary hearings); *King v. Wells*, 760 F.2d 89, 93 (6th Cir. 1985) (invalidating prison's "policy of not permitting witness testimony under any circumstances").

Virginia's policy suffers no similar infirmity. In truth, it is difficult to imagine how Virginia could draft a narrower regulation: DOP 861.14(B)(1) permits prison officials to limit only a type of testimony (live testimony) from a type of witness (an inmate witness) at a type of facility (a Level 5 or 6 prison). If any regulation dealing with witness requests at prison disciplinary hearings is to survive constitutional scrutiny — and *Ponte* suggests some do — surely it is this one. Invalidating DOP 861.14(B)(1) would preclude virtually any policy that dealt with inmates' witness requests, encasing disciplinary proceedings in the sort of "inflexible constitutional straitjacket" that the Supreme Court has condemned. *Wolff*, 418 U.S. at 563. It makes sense to treat inmate witnesses differently from other types of witnesses, and maximum security inmate witnesses differently still.

3.

Thirdly, the reasonableness of Virginia's regulation could hardly be clearer than in its application to the present case. Numerous officers witnessed the fight between Brown and Beavers; both were treated for their injuries; physical evidence at the scene substantiated the officers' account; and Beavers himself initially said that he had been attacked by Brown. Why then would Beavers change his story? As the district court found, Edmonds believed that Beavers feared what would happen to him in the event that he did not recant. After all, Beavers had already been assaulted once. Had he informed on Brown, either in his written statement or in live testimony at the hearing, it was not difficult for him to imagine how Brown would repay

his forthrightness. Granted, Beavers may well have altered his testimony for reasons other than the risk of retaliation, but that makes it no less reasonable for Edmonds to have taken the risk seriously. If *Wolff* and *Ponte* teach anything, it is that the dictates of due process do not require prison officials to turn a blind eye to the stubborn realities of prison life.

Moreover, Brown made no attempt at his disciplinary hearing to explain the value of calling Beavers as a live witness. Beavers' single sentence — "At no time did inmate D. Brown assault me with his adapter or in any other way" — was the sum and substance of his testimony. This was not a complicated disciplinary hearing: either Brown had assaulted Beavers, or he had not. Edmonds read Beavers' statement into the record at the hearing and was well aware that Beavers denied the assault, just as he was well aware of the ample evidence that Beavers' statement was a post hoc falsification.

While Brown asserts that Beavers would have testified at greater length than his brief, one-sentence written statement, Brown never specifies what else Beavers would have said. Thus even if Edmonds somehow erred in not calling Beavers as a live witness, Brown has not demonstrated that he was harmed by Beavers' testifying in writing rather than in person. *See, e.g.*, *Piggie v. Cotton*, 344 F.3d 674, 678 (7th Cir. 2003) (holding potential due process violation harmless where accused inmate could not explain how witness' live testimony would have helped him); *McGuinness v. Dubois*, 75 F.3d 794, 800 (1st Cir. 1996) (holding lack of live testimony harmless where inmate was able to present defense, supported by witness affidavits); *Powell v. Coughlin*, 953 F.2d 744, 751 (2d Cir. 1991) (holding denial of inmate's witness request for her psychiatrist harmless, in part because psychiatrist's notes were admitted instead).

In fact, as the district court noted, Brown was likely helped — not harmed — by Beavers' absence. Had Beavers testified in person, he would have had to explain his statement to nurses, "I was hit with an adapter," as well as his similar statement to Lieutenant Chris that he had been assaulted by Brown. Surely Beavers would have been asked to account for the flat contradictions in his earlier oral statements and his subsequent written testimony. And then Beavers would have been placed squarely on the hot seat that Edmonds was attempting to

avoid: Beavers could have struggled to explain how he was injured in a fight that never occurred, or he could have informed on Brown and tempted whatever fate befalls jailhouse snitches. No matter Beavers' choice, his testimony could not possibly have added anything to Brown's defense.

### III.

As if Brown's task were not sufficiently Sisyphean, he asks that we gainsay Edmonds' decision within the context of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214. Under AEDPA, we may grant Brown habeas corpus relief only if the Supreme Court of Virginia's dismissal of Brown's petition was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2000). Yet the Supreme Court's case law in this area dictates precisely the opposite result from that urged by Brown.

Again and again, the Supreme Court has cautioned that we should be hesitant to substitute our judgments for those of prison administrators. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995) ("[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."); *Ponte*, 471 U.S. at 499 ("Given [*Wolff*'s] significant limitations on an inmate's right to call witnesses, and given our further observation in *Wolff* that '[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators,' it may be that a constitutional challenge to a disciplinary hearing . . . will rarely, if ever, be successful.") (citation omitted); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126 (1977) ("Because the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators."); *Wolff*, 418 U.S. at 566-67 ("[Prison officials] must have the necessary discretion [to limit the calling of witnesses] without being subject to unduly crippling constitutional impediments."). Here, Inmate Hearing Officer Edmonds considered the merits of Brown's witness request, but concluded that legitimate penological interests warranted denying the request. Perhaps chief among those interests, Edmonds acted to protect one of the inmates whose safety

was entrusted to his care. We cannot say that his effort ran afoul of the constraints of due process. The judgment of the district court is therefore

*AFFIRMED.*