**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-6403

NICHOLAS LENNEAR,

Petitioner - Appellant,

v.

ERIC WILSON, Warden F.C.I. Petersburg,

Respondent - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Mark S. Davis, District Judge.  (2:17−cv−00135−MSD−LRL)

Argued:  May 8, 2019                              Decided:  August 23, 2019

Before MOTZ, WYNN, and RICHARDSON, Circuit Judges.

Vacated and remanded by published opinion.  Judge Wynn wrote the opinion, in which Judge Motz joined.  Judge Richardson wrote a dissenting opinion.

**ARGUED:**  Emily Rebecca Gantt, MCGUIREWOODS LLP, Norfolk, Virginia, for Appellant.  Kent Pendleton Porter, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.  **ON BRIEF:**  Bradley R. Kutrow, Anne L. Doherty, MCGUIREWOODS LLP, Charlotte, North Carolina, for Appellant.   G. Zachary Terwilliger, United States Attorney, Lauren A. Wetzler, Chief, Civil Division, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

WYNN, Circuit Judge:

Petitioner Nicholas Lennear ("Petitioner"), a federal inmate, appeals a decision holding that prison officials did not violate Petitioner's due process rights when the officials did not review allegedly pertinent video surveillance evidence in a disciplinary proceeding that led to revocation of Petitioner's good time credits.

We hold that, under the Supreme Court's decision in *Wolff v. McDonnell*, 418 U.S. 539 (1974), inmates at risk of being deprived of a liberty interest, like good time credits, have a qualified right to obtain and present video surveillance evidence. Because the district court failed to make several factual critical determinations bearing on whether Petitioner's disciplinary proceeding failed to comply with that right, we vacate the district court's decision and remand the case for further proceedings consistent with this opinion.

I.

On October 17, 2012, the United States District Court for the Middle District of Florida sentenced Petitioner to a 120-month term of imprisonment for committing several federal drug offenses. Based on Bureau of Prisons records, Petitioner is scheduled to be released in early 2021, assuming his entitlement to good-time credits.

This action arises from disciplinary proceedings that occurred during Petitioner's incarceration at the Coleman Federal Correctional Complex in Florida ("FCC Coleman").[1]

---

[1] When Petitioner filed his habeas petition, he was housed at the Federal Correctional Complex in Petersburg, Virginia ("FCC Petersburg"), which lies within the jurisdiction of the United States District Court for the Eastern District of Virginia. The Bureau of Prisons subsequently transferred Petitioner to the low-security Federal Correctional Institution Seagoville, in Texas, and then to Federal Correctional Institution (Continued)

2

The disciplinary proceedings stemmed from a June 11, 2016, incident between Petitioner and a correctional officer, Case Manager K. Lemos ("Case Manager Lemos"). The incident took place during the morning inmate count in the B-1 Housing Unit at FCC Coleman. That unit housed approximately 170 inmates, including Petitioner. Due to unspecified reasons, Case Manager Lemos and another correctional officer had trouble conducting the morning count, forcing them to recount the unit twice. Because of inmates' comments regarding the officers' difficulty conducting the count, Case Manager Lemos ordered that all inmates in the unit stay in their cubicles until the conclusion of the count.

Case Manager Lemos and Petitioner offered different accounts as to what happened after the officers ordered the inmates to stay in their cubicles. According to a report filed by Case Manager Lemos on the afternoon of the day of the incident, after the officers ordered the inmates to stay in their cubicles, Petitioner "started to leave his cube." J.A. 45. Case Manager Lemos then gave Petitioner a "direct order" to stay in his cubicle, but Petitioner "became resistant to [her] instructions and continued to approach [Lemos]." J.A. 45. The report states that Petitioner "continued to walk towards [her] and became loud and aggressive, stating 'You have an issue with me because of Nowicki and I[']m tired of this shit.'" J.A. 45. Petitioner was allegedly referring to Counselor T. Nowicki, who is another member of the prison staff.

_____

Jesup, in Georgia, where Petitioner remains housed. Appellant's Br. at 4 n.1; *Nicholas Lennear*, www.bop.gov/inmate/loc (visited August 23, 2019). When the "Government moves a habeas petitioner after [he] properly files a petition naming [his] immediate custodian, the District Court [where the petitioner filed a petition] retains jurisdiction." *Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004).

3

Case Manager Lemos reported that she then gave Petitioner a second direct order to return to his cubicle, with which he complied. According to the report, after Petitioner returned to his cubicle, he started yelling to the other inmates in the unit, stating: "'This is bullshit, they all treat us bad'[,] 'Respect deserves respect! Look how they are treating us'[, and] 'We shouldn't have to put up with this shit.'" J.A. 45. The report states that Petitioner's statements "encouraged other inmates to become loud and aggressive" and specifically encouraged another inmate, Wilson, to begin screaming at Case Manager Lemos. J.A. 45. The report stated that Case Manager Lemos immediately notified the Operations Lieutenant and requested assistance, and that officers later removed Petitioner and Wilson from the unit.

Petitioner, who was fifty-five at the time of the incident, offered a somewhat different account of the incident during the disciplinary hearing. Due to "severe heart problems and diabetes," Petitioner takes several medications requiring him to frequently use the restroom. J.A. 17. Petitioner averred that when the officers ordered him and the other inmates to remain in their cubicles, he "already had to use the restroom badly" and so he "immediately raised and waived [sic] [his] hand asking to use the restroom." J.A. 18. According to Petitioner, Case Manager Lemos told Petitioner to wait, which he did. But while Petitioner was waiting, Case Manager Lemos "let 3 other inmates use the restroom who had asked to go after [him]." *Id.* Fearing that he was about to urinate on himself, Petitioner asked Case Manager Lemos "again" to use the restroom, to which she again said "No." *Id.* Petitioner stated that, at that point, he asked Case Manager Lemos if she was denying his requests to use the restroom because of "issues that [he] had" with

4

Counselor Nowicki.[2]  *Id.*  Petitioner alleged that Case Manager Lemos and Counselor Nowicki had a romantic relationship.

Petitioner specifically disputed several aspects of the account of the incident set forth in Case Manager Lemos's report.  In particular, although Petitioner conceded that he asked Case Manager Lemos whether she was treating him "like this because of the issues that [he] had with Counselor Nowicki," Petitioner claims that, contrary to the incident report, he never stated "I was tired of this shit" nor did he make any of the other comments the report identified as inciting Wilson and the other inmates.  J.A 18.  Petitioner further asserted that he "never encouraged anyone to demonstrate or to disregard staff directives. [He] only asked to use the restroom before [he] did so on [him]self."  *Id.*  Lastly, Petitioner disputed the report's assertion that prison staff had to remove him from the unit.  Instead, Petitioner averred that after his conversation with Case Manager Lemos ended, she went to another part of the unit to finish the inmate count and subsequently directed Petitioner and another inmate to report, unescorted, to a lieutenant.

Case Manager Lemos's incident report charged Petitioner with a Code "299 most like 212" violation for "conduct disruptive to the security of the institution (high) most like engaging or encouraging a group demonstration."  J.A. 45.  A violation in the Code 200 "high severity level prohibited acts" falls within the second most severe class of offenses, below only Code 100 level prohibited acts, which include killing, rioting, drug use, and sexual assault.  *See* U.S. Dep't of Justice Federal Bureau of Prisons, Program Statement

---

[2] Petitioner stated that Counselor Nowicki and he "have had issues from the first day [Petitioner] arrived at FCI Coleman Low."  J.A. 17.

5720.09: Inmate Discipline Program, at 46-48 (eff. Aug. 1, 2011), https://www.bop.gov/policy/progstat/5270_009.pdf ("Bureau of Prisons Program Statement").[3] Because of the severity of the charged offense, Petitioner was subject to the potential forfeiture of "earned statutory good time or non-vested good conduct time up to 50% or up to 60 days, whichever is less," among other penalties. *Id*. at 49.

After the issuance of an incident report, like the report filed by Case Manager Lemos, Bureau of Prisons regulations provide for an initial investigation.[4] 28 C.F.R. § 541.5(b). Lieutenant A. Brinson conducted that investigation, which consisted of advising Petitioner of his right to remain silent, taking a statement from Petitioner, and providing Petitioner with other facts about the incident. According to a report prepared by Lieutenant Brinson at the conclusion of his investigation, Petitioner stated he had "no staff witnesses for this report." J.A. 46. The report, however, did not mention whether Petitioner referred to or requested video evidence. Lieutenant Brinson found that the charge in Case Manager Lemos's incident report was substantiated and referred the report to the Unit Discipline

---

[3] A Bureau of Prisons Program Statement is an "internal agency guideline . . . akin to an interpretive rule that does not require notice and comment," but "is still entitled to some deference." *Reno v. Koray*, 515 U.S. 50, 61 (1995) (citations and internal alterations omitted).

[4] During the initial investigation, a Bureau of Prisons staff member (1) informs inmates of their charges and their right to remain silent during the disciplinary process; (2) asks inmates for a statement, at which time inmates may provide an "explanation of the incident, request any witnesses be interviewed, or request that other evidence be obtained and reviewed;" and (3) if applicable, informally resolves the incident report. 28 C.F.R. § 541.5(b).

Committee ("Discipline Committee"). *See* 28 C.F.R. § 541.7 ("A Unit Discipline Committee . . . will review the incident report once the staff investigation is complete.").

Counselor Nowicki, the same prison staff member mentioned by Petitioner to Lemos, chaired FCC Coleman's Discipline Committee.[5] Based on the "severity of the [incident] report," on June 13, 2016, the Discipline Committee referred the charge to the Discipline Hearing Officer ("Hearing Officer") for a further hearing and recommended the maximum available reduction of Petitioner's good-time credits. J.A. 45. According to the Discipline Committee, Petitioner "declined to comment to the [Committee]." *Id.*

The Notice of Disciplinary Hearing advised Petitioner that he had the "right to call witnesses at the hearing and to present documentary evidence in [his] behalf; provided, calling your witnesses will not jeopardize institutional safety." J.A. 47. Petitioner indicated on the form that he declined to call any witnesses and signed the form. Although the Notice advised Petitioner of his right to present documentary evidence, it did not contain any corresponding space for him to request or decline access to documentary evidence, as it did with witness requests.

After conducting a hearing, the Hearing Officer issued a report on June 29, 2016, finding that Petitioner committed the acts as charged in the incident report. The Hearing Officer's report stated that, at the hearing, Petitioner did not request witnesses; that the

---

[5] Nowicki chaired the Discipline Committee even though 28 C.F.R. § 541.7(b) provides that Unit Discipline Committee members "will not be victims, witnesses, investigators, or otherwise significantly involved in the incident." As described above, Petitioner asked Lemos whether she was not allowing him to go to the restroom "because of the issues that [he] had with Counselor Nowicki." J.A. 18.

7

Hearing Officer did not consider any documentary evidence; and that Petitioner stated that he had no documentary evidence to present. At the hearing, Petitioner reiterated that he asked to go to the bathroom; that, while the inmates were ordered to stay in their cubicles, Case Manager Lemos let three other inmates go to the restroom, but repeatedly rejected Petitioner's requests; and that he questioned whether Case Manager Lemos's decision to deny Petitioner's requests was related to his contentious relationship with Nowicki. The Hearing Officer's report did not state whether Petitioner *requested* access to or review of any video recordings of the incident—or any other documentary evidence.

Acknowledging that Petitioner's account of the events conflicted with aspects of Case Manager Lemos's report, the Hearing Officer gave "greater weight" to Case Manager Lemos's account. J.A. 15. In particular, the Hearing Officer found that Petitioner stated, "You have an issue with me because of Nowicki and I'm tired of this shit." *Id*. The Hearing Officer further found that Petitioner, upon returning to his cubicle, started yelling statements to the other inmates, including: "This is bullshit, they all treat us bad" and "Respect deserved respect, look how they are treating us, we shouldn't have to put up with this shit." *Id*. "These statements," the Hearing Officer found, encouraged Wilson to begin screaming at Case Manager Lemos. *Id*. Given the heightened security concerns associated with the presence of a large number of inmates in an enclosed space during the count, the Hearing Officer concluded that there was a "potential of [Petitioner's] behavior elevating the incident to a more serious level by attracting the attention of all the other inmates in the housing unit, and causing them to also join [him] in [his] protest, or even taking more dangerous actions." J.A. 16. Finding that Petitioner committed the offense as charged, the

8

Hearing Officer revoked 27 days of Petitioner's good-time credits, imposed 30 days of segregation and impoundment of personal property, and canceled 120 days of Petitioner's commissary and visiting privileges.

On July 2, 2016, Petitioner appealed the Hearing Officer's decision to the Regional Director. Petitioner's appeal stated that at the investigation stage, the Discipline Committee stage, *and* the disciplinary hearing stage of his disciplinary proceedings, he "asked that the cameras be reviewed to validate [his] entire statement." J.A. 18. According to Petitioner's appeal, his request for access to and consideration of any video surveillance evidence of the incident was denied at each stage of the proceedings, in violation of his rights under Bureau of Prison regulations and the Due Process Clause.

The Regional Director denied Petitioner's appeal. Regarding Petitioner's alleged request for video surveillance evidence, in particular, the Regional Director stated, without citing any record evidence or testimony, that Petitioner did not timely "request a review of video footage when presenting [his] defense to the charges," and therefore forfeited any right to obtain or rely on such evidence. J.A. 19.

Petitioner appealed the Regional Director's decision to the Central Office on November 17, 2016, once again representing that he repeatedly and unsuccessfully requested any video surveillance evidence pertaining to the incident. Petitioner stated that he was told by Lieutenant Brinson that video footage was only reviewed in incidents involving knives. Petitioner further contended that his conduct constituted a violation of Code 307 and 312—which pertain to a refusal to obey an order of any staff member and insolence towards a staff member—rather than Code 299 (most like Code 212), as Case

9

Manager Lemos's report asserted and the Hearing Officer found. Petitioner requested that the Central Office either expunge the incident report from his record or hold a new disciplinary hearing to allow consideration of the requested video surveillance evidence. The Central Office did not respond, and therefore, under governing regulations, the appeal was deemed denied. *See* 28 C.F.R. § 542.18.

On March 6, 2017, Petitioner filed a habeas petition under 28 U.S.C. § 2241 in the United States District Court for the Eastern District of Virginia,[6] on grounds that the disciplinary review process violated his due process rights because he was denied access to and official consideration of video surveillance evidence of the incident, citing *Wolff v. McDonnell*, 418 U.S. 539 (1974).[7] Petitioner's petition reiterated that he asked three officers—Lieutenant Brinson at the investigation stage; Counselor Nowicki at the Discipline Committee stage; and Officer Carroll at the hearing—to review any video evidence of the incident, all of which requests were denied. Petitioner again stated that, at the investigation stage, he was told that video evidence is "only reviewed if a knife is involved."

The district court referred the matter to a magistrate judge. Petitioner provided a sworn affidavit again averring that he requested consideration of video surveillance

---

[6] "[A] prisoner seeking the restoration of good time credits in federal court may only do so by way of writ of habeas corpus." *Pierce v. Freeman*, 121 F.3d 699 (4th Cir. 1997) (unpublished) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)).

[7] Petitioner's petition also challenged the sufficiency of evidence supporting his charge under *Superintendent v. Hill*, 472 U.S. 445 (1985), but that claim was not pressed on appeal.

10

evidence of the incident at the investigation, Discipline Committee, and hearing stages, and that each request was denied. The Government did not offer an affidavit—or any other evidence—controverting Petitioner's affidavit. On February 8, 2018—and without holding an evidentiary hearing—the magistrate issued a report and recommendation recommending that Petitioner's disciplinary proceedings did not violate his procedural due process rights, and therefore that the district court deny and dismiss with prejudice the petition. *Lennear v. Wilson*, No. 2:17-cv-135, 2018 WL 1312003, at *4–6 (E.D. Va. Feb. 6, 2018). The district court adopted and approved the report and recommendation in its entirety, denying the petition and dismissing it with prejudice. *Lennear v. Wilson*, 2:17-cv-135, 2018 WL 1307878, at *1 (E.D. Va. March 13, 2018).[8]

Petitioner timely appealed. After Petitioner filed his informal brief (to which the Government declined to respond), this Court appointed counsel for Petitioner and requested formal briefing on three issues:

> 1. If timely requested, did Lennear have a due process right to compel discovery of video surveillance evidence as part of his disciplinary proceeding?
>
> 2. If timely requested, did Lennear have a due process right to have prison officials review video surveillance evidence as part of his disciplinary proceeding?
>
> 3. If prison inmates do have a due process right to compel discovery or review of video surveillance evidence, did prison officials deprive Lennear of the right based on the record in this case?

---

[8] Because the district court adopted and approved the magistrate's report and recommendation in its entirety as its own opinion, this opinion refers to the report and recommendation as the district court's opinion.

11

II.

We review the district court's denial of Petitioner's Section 2241 petition de novo. *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 530 (4th Cir. 2005). To resolve Petitioner's appeal, we first must determine in what circumstances, if any, Petitioner has a procedural due process right to obtain access to and compel official review of video surveillance evidence as part of his disciplinary proceeding.[9]

In *Wolff*, the Supreme Court recognized that constitutional procedural due process protections extend to prison disciplinary proceedings that could adversely impact an inmate's liberty interests—such as the loss of good time credits at issue here. 418 U.S. at 555; *see also Ponte v. Real*, 471 U.S. 491, 495 (1985) (describing "good time" credits as a liberty interest "which could not be taken from [the inmate] in a prison disciplinary hearing" without due process). The Supreme Court held that in a disciplinary proceeding in which an inmate's liberty interests are at stake, government officials must provide the inmate with written notice of the charges at least 24 hours before the hearing as well as a written report after the hearing detailing the evidence relied upon and the reasons for the

---

[9] Petitioner argues in the alternative that we should recognize a qualified due process right under *Brady v. Maryland*, 373 U.S. 83 (1963). However, because Petitioner presented only a *Wolff* claim below—and because we resolve this case on those grounds—we decline to decide whether *Brady* extends to prison disciplinary hearings. *Compare Wise v. Carpenter*, 838 F.2d 469 (4th Cir. 1988) (unpublished) (rejecting that "the full panoply of criminal trial rights flowing from *Brady* and its progeny apply to prisoners in disciplinary settings"), *with Chavis v. Rowe*, 643 F.2d 1281, 1286 (7th Cir. 1981) (applying *Brady* to prison disciplinary proceedings).

12

disciplinary action. *Segarra v. McDade*, 706 F.2d 1301, 1304 (4th Cir. 1983) (citing *Wolff*, 418 U.S. at 564).

*Wolff* further recognized that, in such proceedings, an inmate has a qualified right "to call witnesses and present documentary evidence in his defense." *Wolff*, 418 U.S. at 566. This right is "part of the substantive foundation of procedural due process for inmates." *Dalton v. Hutto*, 713 F.2d 75, 77 (4th Cir. 1983). Emphasizing the need for "mutual accommodation" of institutional needs and constitutional rights, the Supreme Court held that inmates may call witnesses or present documentary evidence unless "unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 556, 566. In so doing, the *Wolff* Court "struck a careful balance between inmates' due process interests and the legitimate goals and security concerns of a penal institution." *Dilworth v. Adams*, 841 F.3d 246, 253 (4th Cir. 2016); *see also Wolff*, 418 U.S. at 555–556 (noting that a prisoner's rights may be "diminished" by institutional needs but "a prisoner is not wholly stripped of constitutional protections when . . . imprisoned for crime").

Although this Court, to date, has not addressed whether the universe of "documentary evidence" subject to the due process protections recognized in *Wolff* encompasses video surveillance evidence, we agree with the parties that it does. *See* Gov't Br. at 10 ("The Warden agrees that video surveillance footage falls within the ambit of documentary evidence under *Wolff*[.]"). This Court has previously considered video evidence, broadly speaking, to constitute "documentary evidence." *See, e.g.*, *Witt v. W. Va. State Police, Troop* 2, 633 F.3d 272, 276 (4th Cir. 2011) (describing "documentary evidence, such as a video"). And in the prison disciplinary proceeding context, in

13

particular, our sister circuits universally have treated prison video surveillance evidence as a form of documentary evidence potentially subject to disclosure and review under *Wolff*. *See, e.g.*, *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 173 (3d Cir. 2011) (considering an inmate's request for videotape to be a request for documentary evidence); *Howard v. U.S. Bureau of Prisons*, 487 F.3d 808, 815 (10th Cir. 2007) ("[T]he Bureau's refusal to produce and review a videotape . . . violated his due process right to present documentary evidence in his own defense."); *Piggie v. Cotton*, 344 F.3d 674, 679 (7th Cir. 2003). In light of this precedent, we now hold that prison video surveillance evidence constitutes documentary evidence subject to the procedural due process protections recognized in *Wolff*.

Like other forms of documentary evidence subject to *Wolff*'s procedural due process protections, an inmate's due process rights related to video surveillance evidence has at least two dimensions: (A) the qualified right of access to such evidence and (B) the qualified right to compel official review of such evidence.

A.

Regarding the first dimension—the qualified right of access—upon request, an inmate is entitled to access[10] prison video surveillance evidence pertaining to his or her disciplinary proceeding unless the government establishes that disclosure of such evidence would be, under the particular circumstances of the case, "unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. Allowing an inmate access to video

---

[10] We decline to say under what conditions an inmate may access video surveillance evidence. Namely, we do not reach the issue of *how* video access is provided to the inmate, for example, by allowing the inmate to watch the video recording, providing the inmate with the video recording, or some other means.

14

surveillance evidence—so long as such access does not infringe on legitimate penological interests—constitutes an essential aspect of the inmate's due process right to "marshal facts in his defense and present witnesses and documentary evidence at the hearing." *Gibbons v. Higgins*, 73 F.3d 364, 364 (7th Cir. 1995) (table); *see also Cannistraci v. Van Der Veur*, 106 F.3d 413 (10th Cir. 1997) (same).

The Government maintains that because *Wolff* refers only to a right to "present" documentary evidence in prison disciplinary proceedings, inmates have no right of "access" to such evidence. We disagree.

As the First Circuit has explained, "if an inmate has a circumscribed right to present documentary evidence, logic dictates that he must also have some possible means for obtaining it." *Smith v. Mass. Dep't of Corr.*, 936 F.2d 1390, 1401 (1st Cir. 1991); *see also Whitmore v. Parker*, 525 Fed. App'x 865, 866 (10th Cir. 2013) (Gorsuch, J.) ("[I]t is surely true . . . that denying a prisoner *access* to potentially exculpatory evidence can implicate his procedural due process rights." (emphasis added) (citing *Wolff*, 418 U.S. at 563)). Access to documentary evidence, such as video surveillance evidence, may well prove "central to the construction of a defense," as it could prove exculpatory (for example, if it counters a correctional officer's version of events) or assist the inmate in identifying other relevant evidence or witnesses. *Smith*, 936 F.3d at 1401; *see also Sherrod v. Rardin*, 230 F.3d 1367 (9th Cir. 2000) (unpublished) (concluding that an inmate's due process claim was meritorious when he was "denied access to a videotape of the riot" and noting that the video was "the basis for all the statements and reports by prison officers" relied upon by the hearing officer). Video footage, like other forms of documentary evidence, is

15

particularly valuable to inmates in disciplinary proceedings because inmates, like Petitioner, "obviously face[] a severe credibility problem when trying to disprove the charges of a prison guard." *Hayes v. Walker*, 555 F.2d 625, 630 (7th Cir. 1977) (quoting *Wolff*, 418 U.S. at 583 (Marshall, J., dissenting in part)); *see also Dalton*, 713 F.2d at 78 (explaining that the qualified right to develop and present evidence recognized in *Wolff* "is especially critical in the prison context where an inmate already begins with a credibility problem").

For these reasons, other circuits have held that the qualified right to "present" evidence in prison disciplinary proceedings necessarily contemplates a qualified right to access such evidence, particularly evidence that is potentially exculpatory or otherwise likely to assist an inmate in mounting a defense. *See, e.g.*, *Howard*, 487 F.3d at 814 ("The [Hearing Officer's] unjustified refusal to *produce* and review [video surveillance evidence] deprived [an inmate] of the process due him." (emphasis added)); *Smith*, 936 F.2d at 1401; *Rasheed-Bey v. Duckworth*, 969 F.2d 357, 361 (7th Cir. 1992) ("[A]n inmate is also entitled to disclosure of exculpatory evidence, unless that disclosure would unduly threaten institutional concerns."); *Meis v. Gunter*, 906 F.2d 364, 367 (8th Cir. 1990) ("[Inmates] have a right to reasonable access to information necessary to put on a defense, including prison documents . . . ."). The Government cites no case to the contrary, nor have we identified any such case. Accordingly, we hold that the procedural due process protections afforded to inmates in disciplinary proceedings encompass a qualified right of access to video surveillance evidence.

16

As *Wolff* makes clear, an inmate's right of access to video surveillance evidence—like any other form of documentary evidence—must give way if the government establishes that providing the inmate with access to such evidence would be "unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566. Although we need not comprehensively set forth the universe of "safety or correctional goals" that can justify a penological institution's decision to deny or otherwise place limits on an inmate's access to video surveillance to resolve this case, four overarching principles are worthy of emphasis.

First, prison officials bear the "burden to come forward with evidence of the reasons for" denying an inmate's request for access to documentary evidence, including video surveillance footage. *Smith*, 936 F.2d at 1400. Prison officials may wait to assert such institutional concerns until after the disciplinary hearing. *See Ponte*, 471 U.S. at 497 (holding that prison officials "may choose to explain their decision [for denying access to documentary evidence] at the [disciplinary] hearing, or they may choose to explain it 'later'" in court).[11] But if prison officials fail to identify a specific safety or correctional concern, courts may not "speculate" as to the officials' potential reasons for denying an inmate access to evidence in order to uphold a disciplinary decision. *See Smith*, 936 F.2d at 1400.

---

[11] Although *Ponte* pertained to witness requests, the *Wolff* Court made clear that "an inmate's right to call witnesses and to present documentary evidence . . . stood on the same footing." *Smith*, 936 F.2d at 1401 (citing *Wolff*, 418 U.S. at 566).

17

Second, prison officials must consider documentary evidence requests, including requests for video surveillance evidence, on an "individualized basis." *Howard*, 487 F.3d at 813; *see also Whitlock v. Johnson*, 153 F.3d 380, 387 (7th Cir. 1998) (emphasizing that a "rule excluding a class or category of witnesses is presumptively disfavored"). To that end, this Court consistently has rejected blanket policies of exclusion and emphasized the importance of case-by-case analysis in deciding to grant or deny inmate requests to obtain access to or present evidence.

For example, in *Dalton v. Hutto*, we held unconstitutional a Virginia Department of Corrections guideline that provided an inmate charged with a punishable offense only the "right to present the *voluntary* testimony of witnesses, either inmates or correctional personnel or others, in his/her own behalf." 713 F.2d at 76 (emphasis in original) (citation omitted). We concluded that such a "preclusion of an entire class of witnesses (*i.e.*, anyone who rather would not appear)" would eviscerate an inmate's due process right to call witnesses in his defense. *Id*. at 78. Such "*per se* proscriptions against the calling of certain categories of witnesses are violative of the Supreme Court's admonition that the decision to preclude the calling of witnesses should be made on a *case-by-case analysis* of the potential hazards which may flow from the calling of a *particular person*." *Id*. (emphasis added) (internal quotation marks omitted).

By contrast, in *Brown v. Braxton*, 373 F.3d 501 (4th Cir. 2004), we upheld a Virginia regulation providing that, on a case-by-case basis, hearing officers could require prisoners housed in Level 5 and 6 facilities—which housed maximum-security inmates convicted of severe offenses—"who wish to present testimony from their fellow inmates . . . to submit

18

written statements in lieu of live testimony," *id.* at 504. Distinguishing the regulation in *Brown* from the regulation in *Dalton*, we concluded that Virginia had "tailored its regulation to meet its penological concerns." *Id*. at 506. Unlike the categorical ban in *Dalton* on live testimony from witnesses, the *Brown* regulation "qualified" the inmate's right to call witnesses instead of "eviscerat[ing]" it. *Id*. at 507.

*Dalton* and *Brown* establish that "categorical" or "absolute" prohibitions limiting inmates' ability to develop or obtain evidence in prison disciplinary proceedings—including, without limitation, prohibitions that apply "system-wide to all disciplinary hearings"—do not satisfy Due Process. *Id*. at 506–07 (collecting cases invalidating "absolute prohibitions . . . applied system-wide"); *see also Ponte*, 471 U.S. at 496 (rejecting prison officials' contention that "'across-the-board' policies denying witness requests are invariably proper"). Importantly, prison officials may not rely on a regulation facially requiring hearing officers to exercise discretion on case-by-case basis to permit or deny an inmate access to documentary evidence, like video surveillance evidence, to try to "cloak" with legality what are, in practice, "arbitrary, and preordained, decisions extending to essentially all cases." *Segarra*, 706 F.2d at 1309–10 (Murnaghan, J., concurring in part and dissenting in part).

Third, if prison officials decide to deny an inmate access to requested documentary evidence, including video surveillance evidence, on grounds that such evidence is not pertinent to the inmate's alleged violation, then that determination must be made by the disinterested hearing officer, not prison officials involved in lodging the charge. As the Third Circuit has explained, "[a]n inmate's right to [access] documentary evidence is . . .

19

undermined if prison officials can bar the inmate from [accessing] the evidence simply by denying that the evidence is relevant. If a disciplinary hearing is to have any substance, the hearing officer must determine relevance of evidence, not corrections officers or employees." *Burns*, 642 F.3d at 174.

Fourth, if prison officials identify a valid penological reason for restricting a particular inmate's access to video surveillance evidence—or any other form of documentary evidence—then, before categorically denying access to such evidence, the prison officials should consider whether alternative avenues are available to provide the inmate with pertinent information included in that evidence. For example, when allowing an inmate to view a surveillance video would pose, in a particular case, safety or security concerns, prison officials might instead provide the inmate with a written summary of the video, as well as enter the video into evidence as a confidential exhibit.[12] *See Berry v. Knight,* 770 Fed. App'x 265, 265 (7th Cir. 2019) (noting that the hearing officer denied an inmate's request to view the footage based on security considerations but provided him with a summary); *see also Bogue v. Vaughn*, 439 Fed. App'x 700, 705 (10th Cir. 2011) ("As a general matter, institutional concerns may dictate reliance on a summary of videotape evidence in lieu of providing a prisoner with access to the tape itself.").

---

[12] In this case, for example, Petitioner acknowledged in his sworn affidavit before the district court that the Hearing Officer "could view that [video] footage outside [his] presence in order to make it part of the record" to obviate any security concerns in providing him direct access. J.A. 50.

20

## B.

As to the second dimension—the right to have video surveillance evidence considered in disciplinary proceedings—upon an inmate's request, the disciplinary hearing officer must review video surveillance unless the government establishes that *consideration* of such evidence would be, under the particular circumstances of the case, "unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566.

Courts repeatedly have found procedural due process violations when hearing officers decline to consider video surveillance evidence—or other forms of documentary evidence—without offering a constitutionally cognizable justification for refusing to do so. For example, in *Howard*, the Tenth Circuit concluded that a hearing officer violated an inmate's procedural due process rights when the officer "refused to consider [] videotape evidence" despite an express request by the inmate that the officer do so. 487 F.3d at 811.

The hearing officer declined to review the videotape evidence on grounds that such evidence would be "needlessly cumulative" of staff reports. *Id*. at 814. Characterizing the reasoning underlying the hearing officer's refusal to review the videotape as "Orwellian," the Tenth Circuit rightly reasoned that if prison officials could refuse to review documentary evidence—like the videotape evidence at issue—simply because it *might* prove "cumulative" of statements in staff reports, then inmates, who necessarily face a "credibility problem" in disciplinary proceedings, would be effectively deprived of potentially critical "evidence contradicting statements of prison staff." *Id.* (internal quotation marks omitted). The court further emphasized that the hearing officer "could not possibly have known the videotape was needlessly cumulative without looking at it." *Id*.

21

Similarly, in *Piggie v. McBride*, 277 F.3d 922 (7th Cir. 2002), the Seventh Circuit held that an inmate's procedural due process rights were violated when prison officials refused to review a surveillance tape for no reason, *id.* at 925. Prison officials "may not arbitrarily refuse to consider [potentially] exculpatory evidence simply because other evidence in the record suggests guilt," the court rightly explained. *Id.* (internal quotation marks omitted).[13]

As with the right of access to documentary evidence, the right to compel official consideration of video surveillance evidence, like other forms of documentary evidence, must give way if the government establishes that, under the particular facts of the case, consideration of such evidence would be "unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. Again, a comprehensive discussion of which "safety or correctional goals" are constitutionally sufficient to justify a refusal to consider video surveillance or other forms of documentary evidence is beyond the scope of this opinion. Nevertheless, several points are worth emphasizing.

To begin, just as with the qualified right of access to video surveillance and other forms of documentary evidence, (1) the government bears the burden of establishing a legitimate penological justification for refusing to consider such evidence; (2) whether an asserted penological justification warrants denying consideration of such evidence must be

_____

[13] This requirement is reflected in the Bureau of Prisons 2011 instructions, which provide that "if the inmate requests exculpatory evidence, such as video or audio surveillance, the investigator must make every effort to *review* and preserve the evidence." *See* Bureau of Prisons Program Statement, at 19 (emphasis added). It would thus appear that the Bureau of Prisons does not generally find institutional concerns to be inconsistent with the presentation and review of video surveillance evidence.

22

assessed on a case-by-case basis; (3) to the extent consideration of such evidence is denied on grounds that the evidence is not pertinent, that determination must be made by the hearing officer, not prison officials involved in lodging the charge; and (4) before categorically refusing to consider such evidence, the government should assess whether any alternative avenues exist for permitting consideration of the evidence, in some form, that protect the asserted legitimate penological consideration for restricting consideration of such evidence.

Additionally, we note that the universe of "safety or correctional" interests justifying prison officials' refusal to *consider* video surveillance evidence will necessarily be smaller than universe of interests sufficient to justify prison officials' refusal to provide access to such evidence. Put simply, many of the safety and correctional interests that justify denying an inmate access to video surveillance evidence—such as the risk that the inmate will learn the location of hidden security cameras or observe wrongdoing by a fellow inmate—do not apply if such evidence is reviewed only by prison officials, not the inmate. As the Third Circuit has explained, "[a]lthough the government may have a very real interest in barring an inmate's *access* to certain documentary evidence, that interest is not implicated when it is provided only to the hearing officer[.]" *Burns*, 642 F.3d at 174–75.

Our dissenting colleague characterizes the "overarching principles" set forth above as "pure dictum" because the Government proffered no safety or correctional goal in this specific case. *Post* at 41. We disagree. Dictum is "statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the

23

holding[.]" *Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999). However, when a principle is "clearly integral to the analytical foundations of our holding," then it is not dicta. *Id.* In this case, we establish for the first time in this circuit that inmates at risk of being deprived of a liberty interest, like good time credits, have a qualified right to obtain *and* compel consideration of video surveillance evidence. "Clearly integral" to the "analytical foundations" of that holding is our articulation of the scope of those rights.

All the principles the dissenting opinion characterizes as dictum bear directly on the scope of the qualified rights that this Court was called upon to—and does—recognize: the government bears the burden of establishing a legitimate penological justification for refusing to provide access to or consider the evidence; decisions as to whether to provide access to or consider the evidence must be made on an individualized basis; a decision to deny access to or consideration of such evidence must be made by a disinterested official; and, before categorically refusing to provide access to or consider such evidence, prison officials must assess whether any alternative avenues exist to allow access to or consideration of the evidence. And given the hearing officer's failure to review the video, these principles will be essential to determining the outcome of this case on remand. Accordingly, these obligatory principles are not dicta, but rather "the analytical foundations of the holding." *Id.*

Additionally, these principles largely reflect existing—and controlling—Supreme Court and Fourth Circuit case law. *See Ponte*, 471 U.S. at 497; *Brown*, 373 F.3d at 506–507; *Dalton*, 713 F.2d at 78. Therefore, even if the dissenting opinion's assertion that our

24

explication of these principles amounts to dictum was correct—which, again, it is not—such principles would nonetheless remain controlling.

III.

Having determined that inmates, like Petitioner, have a qualified procedural due process right in disciplinary proceedings to access and compel official consideration of video surveillance evidence, we now consider whether the district court properly dismissed Petitioner's action, notwithstanding that Petitioner never received access to or official review of any video evidence in the government's possession pertinent to the events giving rise to his disciplinary proceeding. Importantly, prison officials never have offered any "safety or correctional goal[]," *Wolff*, 418 U.S. at 566—neither during the disciplinary proceedings nor in these proceedings—justifying their decision to deny access to and review of the requested video surveillance evidence, meaning that penological considerations cannot justify their alleged refusal to disclose or consider such evidence. *See supra* Part II.

The district court nevertheless held that the prison officials did not reversibly err in taking Petitioner's good time credits without disclosing or considering any pertinent video evidence because (A) Petitioner's request for such evidence was untimely and (B) the evidence, if it existed, "would not have changed the outcome" of Petitioner's disciplinary proceeding, therefore rendering any violation of Petitioner's rights harmless. We conclude that the district court erred on both counts.

25

A.

First, the district court held that Petitioner was not entitled to relief because he did not timely seek to discover any video footage of the incident. *Wolff* did not establish a timeliness requirement for requests to access or present documentary evidence. Nevertheless, several circuits have stated that, at least as a general matter,[14] if an inmate fails to request access to or consideration of documentary evidence before or during a disciplinary hearing, then prison officials' failure to disclose or consider such evidence does not amount to a denial of due process. *See Piggie*, 277 F.3d at 925 ("We agree that if [the inmate] failed to make such a request either before or at the hearing, then the [disciplinary board] could not have denied him due process by not considering the request."); *Bliss v. Allenwood*, 558 Fed. App'x 158, 160 n.4 (3d Cir. 2014) (rejecting a due process claim where the inmate never "requested that the [video] footage be presented at the hearing or otherwise reviewed"); *Donahue v. Grondolsky*, 398 Fed. App'x 767, 771 (3d Cir. 2010) (concluding that it was "too late" for a prison official to respond to an evidence request when inmate requested evidence for the first time on appeal).

In denying the petition, the district court stated that the "first time [Petitioner] ever made such a request [for the video footage] was in his appeal of the [disciplinary hearing officer] decision to the Regional Director on July 2, 2016." *Lennear*, 2018 WL 1312003, at *5. That assertion is contradicted by facts in the record before the district court.

---

[14] We need not—and thus do not—address whether exceptional circumstances might excuse an inmate's failure to timely request access to or consideration of video surveillance or other forms of documentary evidence.

26

Petitioner submitted an affidavit to the district court averring that he requested official review of any pertinent surveillance video at three different stages of the disciplinary proceeding—at the initial investigation; at the Unit Discipline Committee level; and at the disciplinary hearing stage. According to the affidavit, Petitioner repeatedly asked the prison officials to "make that footage or a summary of that footage part of the record because that footage would show [his] version of the events" and that "footage was [his] evidence that [he] did not commit the prohibited act as charged." J.A. 49–50.

In contrast, the Government did not introduce any evidence into the district court's record controverting Petitioner's affidavit. Nevertheless, without engaging in any independent fact-finding, the district court determined that Petitioner never requested access to or review of any surveillance videos because "the Regional Director's decision specifically mentions that Petitioner 'did not request a review of the video footage when presenting [his] defense to the charges.'" *Lennear*, 2018 WL 1312003, at *5.

But "when a prisoner who seeks a writ of habeas corpus provides competent evidence (such as an affidavit by someone with personal knowledge of the events) contradicting an assertion by the prison disciplinary board on a material question of fact pertinent to an issue of constitutional law, the district court must hold an evidentiary hearing to determine where the truth lies." *Johnson v. Finnan*, 467 F.3d 693, 694–95 (7th Cir. 2006) (citation omitted). Accordingly, because Petitioner provided an uncontroverted sworn affidavit that he timely requested the video surveillance evidence, without holding an evidentiary hearing the "district court could not properly assume that the [government's] perspective is the right one." *Id*. at 95; *see also United States v. Nicholson*, 475 F.3d 241,

248 (4th Cir. 2007) ("Because the district court denied relief without a hearing, it was not able to make findings of fact on disputed factual issues.").

At oral argument, the Government's lawyer further suggested that this Court can affirm the district court's judgment because, regardless of whether Petitioner lodged a timely request, a video of the incident "never" existed. Oral Argument at 23:26–28:22 ("I am advised now it is not part of the record, I am advised now that there never was a video."). Although the Government had multiple opportunities to do so—in response to Petitioner's regional appeal, when Petitioner's filed his habeas petition, in response to the sworn affidavit Petitioner filed with the district court, and in briefing filed with this Court— it never before claimed that the video never existed, unlike other cases in which the government has repeatedly asserted that the video does not exist. *See, e.g.*, *Anderson v. FCC Coleman-USP II Warden*, 649 Fed. App'x 730, 731 (11th Cir. 2016) (finding no due process violation where the "record indicates that video of the incident does not exist"); *McKoy v. Fox*, 587 Fed. App'x 802, 804 (5th Cir. 2014) (noting the hearing officer's determination and the prison official's sworn declaration that there was no video recording).

Because the Government never argued that a video did not exist, the district court did not engage in fact-finding on that question. Accordingly, like the timeliness issue,

28

whether a video of the incident ever existed is a question of fact that this Court cannot resolve in the first instance.[15]

B.

The Government also contends that we may nonetheless affirm the dismissal of Petitioner's action because, as the district court held, the prison officials' alleged failure to disclose or consider any video surveillance evidence amounted to, at most, harmless error. Oral Argument at 27:15–28:07. According to the district court, any violation of Petitioner's procedural due process rights was "inconsequential" because the hearing officer's determination was based on "some evidence," meaning that "viewing the videotape would not have changed the outcome." *Lennear*, 2018 WL 1312003, at *5.

The district court correctly pointed out that procedural errors in disciplinary proceedings are subject to harmless error review. *See Brown*, 373 F.3d at 508; *Piggie*, 344 F.3d at 679. The district court, however, applied an incorrect legal standard in determining that the failure to disclose or consider the allegedly requested video surveillance evidence was harmless. The district court took the "some evidence" standard from the Supreme Court's decision in *Superintendent v. Hill*, 472 U.S. 445 (1985). But *Hill*'s "some evidence" standard applies in determining the distinct question of whether sufficient evidence supported a decision to revoke good time credits. *Id.* at 447.

---

[15] We note that the Bureau of Prisons instructs that "[i]f the inmate requests exculpatory evidence, such as video or audio surveillance, the investigator must make every effort to review and *preserve* the evidence. It would also be prudent for the investigator to review and *preserve* the video or audio surveillance *even if the inmate does not make a specific request* as such evidence is relevant to the incident." Bureau of Prisons Program Statement, at 19 (emphases added).

29

In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court expressly rejected the use of *Hill*'s "some evidence" standard in the procedural due process context. In particular, the Court held that *Hill*'s "some evidence" standard addresses the "*evidentiary requirements* of due process" but "in no way abrogate[s] the due process requirements enunciated in *Wolff*." *Id*. at 648; *see also Parrish v. Dodrill*, 888 F.2d 1386 (4th Cir. 1989) (unpublished) (noting that the court evaluates the record evidence under *Hill*'s "some evidence" standard "as to [the inmate's] claim *concerning the sufficiency of the evidence against him*" (emphasis added)). Accordingly, *Hill*'s "some evidence" standard is "irrelevant" in determining whether a denial of procedural due process is harmless. *Dean-Mitchell v. Reese*, 837 F.3d 1107, 1113 (11th Cir. 2016); *see also Godlock v. Fatkin*, 84 Fed. App'x 24, 27–28 (10th Cir. 2003) ("Under *Edwards*, it is *immaterial* to our inquiry [into whether the inmate was afforded procedural due process] whether there was some evidence to support petitioner's disciplinary judgment." (emphasis added)); *Viens v. Daniels*, 871 F.2d 1328, 1336 n.2 (7th Cir. 1989) (explaining that a disciplinary board's "refusal to consider evidence or allow the prisoner access to relevant materials" is a procedural due process challenge, not a *Hill* sufficiency of evidence claim).

Rather than applying *Hill*'s "some evidence" standard, courts tasked with determining whether prison officials' failure to disclose or consider testimonial or documentary was harmless have considered whether the excluded evidence could have "aided" the inmate's defense. *Grossman v. Bruce*, 447 F.3d 801, 805 (10th Cir. 2006); *see also Brennan v. United States*, 646 Fed. App'x 662, 666 (10th Cir. 2016) ("A [Hearing Officer's] failure to comply with the *Wolff* requirements is harmless when it does not

30

prejudice an inmate's preparation or defense at a hearing."); *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) (asking whether excluded evidence "might have aided [the inmate's] defense"). Accordingly, we hold that in evaluating whether prison officials' failure to disclose or consider evidence was harmless, courts must determine whether the excluded evidence could have aided the inmate's defense.

Here, because neither the hearing officer nor the district court reviewed the video, we cannot say whether the requested video surveillance evidence might have aided Petitioner's defense. As the Seventh Circuit explained in a similar case, "[w]ithout some idea of what is on the tape, we cannot evaluate the merits of [the inmate's] claim that his defense was hampered by not being given access to it." *Piggie*, 344 F.3d at 679; *see also Howard*, 487 F.3d at 814 (noting that prison officials could not know if a videotape was "needlessly cumulative without looking at it"). If, as Petitioner claims, the video surveillance evidence shows, or provides evidence suggesting, that Petitioner did not make the statements described in Case Manager Lemos's report that allegedly encouraged other inmates to behave aggressively towards prison officials—and we cannot know that without knowing what the alleged video actually depicts—then such evidence would undoubtedly "aid" Petitioner in establishing that he was not guilty of the offense that supported revocation of his good time credits.

The dissenting opinion nonetheless maintains that the prison officials' alleged failure to disclose or consider any video surveillance evidence was harmless because inmates are entitled to obtain and compel disclosure of such evidence only if the evidence is "material." *Post* at 38. The dissenting opinion asserts that, in this case, the video

31

surveillance evidence is material "only if it can prove or disprove [the] allegation" that Petitioner "made oral statements that incited other inmates." *Id.* We disagree.

Contrary to the dissenting opinion's reasoning, an inmate need not demonstrate that the video "prove[s] or disprove[s]" the central allegation of which he or she is charged in order to obtain and compel consideration of video evidence. Rather, as explained above, allowing access to and requiring official consideration of video surveillance evidence represents an essential aspect of the inmate's due process right to assemble evidence in his or her defense. Even if video surveillance does not "prove or disprove" the central allegation in a complaint, such evidence may prove central to that defense, by, for example, aiding the inmate in identifying other relevant evidence or witnesses or contradicting a correctional officer's version of events, and thereby calling into question that officer's credibility. Because neither the district court nor the hearing officer ever viewed the alleged video, we cannot know whether, if at all, it would have aided Petitioner's defense.

The dissenting opinion further asserts that the video is not material because the Government "represented that the prison's surveillance system does not include audio, and [Petitioner] has provided no indication to the contrary." *Post* at 38. The Government made that assertion for the first time in a footnote in its appellate briefing. Gov't Br. at 39 n.6. Consequently, the district court conducted no fact-finding as to whether any video (assuming one existed) included audio. And even if this Court were inclined to engage in independent fact-finding on that point—which it is not—the record before this Court includes no evidence as to whether the prison surveillance system included audio.

32

More significantly, even if the video (assuming it exists) lacks audio, this Court would not be in a position to determine whether the video was "material" for at least two reasons. First, the dissenting opinion's assertion that "prison surveillance videos" are of "notoriously poor quality" (which, if true, would seem to render administrative or judicial reliance on prison surveillance videos equally problematic in cases in which the Government seeks to rely on such evidence) lacks any record support. *Post* at 39. Accordingly, unsupported speculation as to the "quality" of any video has no bearing on the resolution of this case, particularly in light of the fact that neither the district court nor the hearing officer viewed the alleged video—and therefore necessarily made no findings on the video's quality.

Second, even if the alleged video lacks audio, it may nevertheless aid Petitioner's defense. Although Petitioner's disciplinary charges stemmed from his alleged comments, a silent video could still buttress Petitioner's defense by, for example, discrediting key, disputed factual assertions in Case Manager Lemos's report, including that Petitioner was moving aggressively towards Case Manager Lemos before he made the statements and that Petitioner had to be forcibly removed from the unit. Likewise, any video of the incident could buttress the credibility of Petitioner's account of the incident. For example, a video (even one of poor quality) could show that Petitioner calmly raised his hand to go to the bathroom before he made the disputed statements, only to have his request denied, notwithstanding that Case Manager Lemos let several other inmates do so. Such evidence would bear directly on a finder-of-fact's determination as to whether Case Manager Lemos's or Petitioner's account of the incident, and therefore the challenged statements, is

33

more credible. *See United States v. Welsh*, 774 F.2d 670, 672 (4th Cir. 1985) (noting that the fact-finder is the "sole judge[] of the credibility of the witnesses and the weight their testimony deserves"). Additionally, any gestures Petitioner was—or was not—making at the time of the alleged statements may bear on whether the statements were intended to, or had the effect of, inciting other inmates.

IV.

In sum, we hold that Petitioner has a qualified right to access and compel consideration of any video surveillance evidence of the incident giving rise to his loss of good time credits. Because the record before this Court is inadequate to resolve several critical factual questions bearing on whether Petitioner was denied that right, we vacate the district court's decision and remand. *See Johnson v. Brown*, 681 Fed. App'x 494, 496–97 (7th Cir. 2017) (remanding for the district court "to first determine whether the video file still exists"); *Finnan*, 467 F.3d at 694 (remanding for an evidentiary hearing on timeliness).

On remand, the district court should determine, after receiving evidence and hearing argument, whether the requested video surveillance evidence existed at the time of Petitioner's alleged request and whether Petitioner's request was timely. If the district court finds that Petitioner lodged a timely request for the evidence and that the evidence existed at the time of his request, then, in light of the Government's failure to offer any penological justification, Petitioner was entitled to disclosure and official review of the video. By contrast, if the district court determines that Petitioner did not timely request

such evidence, or if the evidence did not exist, then no violation of Petitioner's procedural due process rights occurred.

*VACATED AND REMANDED*

RICHARDSON, Circuit Judge, dissenting:

Nicholas Lennear, a federal prisoner, claims that a case manager maliciously prohibited him from using the bathroom during an inmate count and then filed a false incident report about his behavior. The heart of the dispute comes from the case manager's claim that Lennear, after bickering with her, "started yelling to the other inmates" about their poor treatment at the hands of prison staff, prompting the other inmates "to become loud and aggressive." J.A. 45. The case manager's report led to a disciplinary proceeding, in which Lennear was found to have committed a serious prison infraction. As a result, he was punished with a loss of good time credit, segregation, and loss of privileges.

Lennear argues that this discipline was improper because the prison failed to provide him with (or at least review) supposedly exculpatory video footage. The parties disagree about whether Lennear asked for this review of prison surveillance tapes during the disciplinary proceeding, but they agree that he asked that the tapes be reviewed in appealing the sanctions to other prison officials. After those administrative appeals were denied, Lennear filed a habeas petition asserting that his due process rights were violated when the staff refused his request to review the video footage. The district court denied this claim, and Lennear appealed.[1]

Prisoners retain qualified due process rights while incarcerated. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974); *see also Brown v. Braxton*, 373 F.3d 501, 504–05

---

[1] Lennear's administrative request and habeas petition sought only the review of the video by prison officials. *See* J.A. 18, 50. On appeal, for the first time, he now argues that he has the right to have the video provided to him.

36

(4th Cir. 2004) (discussing prisoner due process rights). As a result, inmates cannot be punished with loss of good time credit absent "those minimum procedures appropriate under the circumstances . . . to insure that the state-created right is not arbitrarily abrogated." *Wolff*, 418 U.S. at 557. This includes a limited right "to call witnesses and present documentary evidence" so long as doing so "will not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566. The Supreme Court has explicitly declined to adopt more demanding procedural protections, recognizing the need for institutional discretion and the fact that prison "disciplinary proceedings are not part of a criminal prosecution." *Id.* at 556. As a result, "the full panoply of rights due [to] a defendant in such proceedings does not apply." *Id.*

The primary issue here is whether and when an inmate's right to "*present* documentary evidence in his defense," *id.* at 566 (emphasis added), includes the right to compel the prison to gather and review (or to provide to the inmate) video evidence in its possession. Unlike both parties and my colleagues, I have doubts that the "minimum procedures" required by the Constitution and set out in *Wolff* include this right. *Cf. Young v. Lynch*, 846 F.2d 960, 963 (4th Cir. 1988) (finding no "clearly established right to demand production of physical evidence" because "*Wolff* . . . does not explicitly confer this right"). That said, the Government has conceded that due process requires prison officials to provide some limited "discovery" to inmates in disciplinary proceedings, so I assume that some qualified right exists.

Even with that assumption, however, any right to discovery in a prison disciplinary hearing is at least limited to information material to the dispute at hand. *See Ward v.*

37

*Johnson*, 690 F.2d 1098, 1113 (4th Cir. 1982) (en banc) (recognizing that prison disciplinary officials have "a right to refuse to hear witnesses whose testimony might be irrelevant or cumulative").[2]   The Constitution does not require, even in the criminal context, broad and unfettered discovery.  Rather, defendants' "full panoply of rights" merely prevents the prosecution from withholding material exculpatory information, where material information is something that creates a reasonable probability that the result at trial would have been different had the evidence been disclosed.  *See Smith v. Cain*, 565 U.S. 73, 75 (2012).  And there is surely not a broader constitutional right to discovery in the prison-discipline context.

The requested video footage is not material, and so prison officials did not violate Lennear's due process rights by failing to review it.  His disciplinary charge rested on the case manager's assertion that he made oral statements that incited other inmates.  And so the video evidence is material only if it can prove or disprove that allegation.  But it cannot. The Government has represented that the prison's surveillance system does not include audio, and Lennear has provided no indication to the contrary.  Without sound, the video cannot clarify what Lennear said.  I, therefore, cannot conclude that prison officials were constitutionally required, in deciding whether to discipline him, to review a video merely on the speculation that one could read Lennear's lips.

---

[2] There is a cost to pulling and reviewing surveillance footage.  If prison officials had to accede to every inmate request for such review, regardless of materiality, the cumulative costs would indeed be "unduly hazardous to . . . correctional goals." *Wolff*, 418 U.S. at 566.  Frivolous litigation and pointless discovery can quickly add up to a massive drain on limited prison time and resources.

Lennear argues that the footage could still show "whether Lennear was mouthing words towards the other inmates or gesturing towards them." Appellant's Reply Brief at 14. Even if the footage were both filmed from an ideal position and crystal clear (unrealistic given the notoriously poor quality of prison surveillance videos), it still would not be material. Lennear's discipline turned on what he said, not on which direction he was facing or on what he was doing with his hands while he said it. Both Lennear and the case manager agree that he said *something*, so there is no possibility that the video will show Lennear standing silent. The dispute is whether Lennear said (as the case manager claimed), "This is bullshit, they all treat us bad," and "We shouldn't have to put up with this shit." J.A. 45. If the video showed Lennear mouthing words toward other inmates while waving his arms aggressively, it would strongly bolster the case manager's account. But the inverse is not true. If the video only showed Lennear speaking, that would still be consistent with the discipline he received. As a result, no matter whether there is a potential constitutional right to discover *material* surveillance footage, Lennear could get no tangible benefit by obtaining this soundless footage.

My colleagues in the Majority do not dispute that at least some minimal relevance is required. But in doing so, the Majority suggests an inmate "is entitled" to video so long as it somehow "pertain[s] to his or her disciplinary proceeding." *Ante* at 14. This unprecedented threshold standard is far more expansive than that applicable for criminal discovery (perhaps even for civil discovery) and is ripe for abuse, allowing inmates to force prisons to engage in costly discovery for almost any reason and without any requirement of materiality.

Even more troubling, the Majority holds that these "pertinence" decisions must be made by the hearing officer, and therefore necessarily must be made contemporaneously. This holding conflicts with the Supreme Court's guidance. The Court has required "a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Wolff*, 418 U.S. at 564 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972)). But the Court has affirmatively explained that prison officials need not make contemporaneous records of their evidentiary decisions. Over thirty years ago, the Supreme Court declined to "'prescribe' as constitutional doctrine that the disciplinary board must state in writing at the time of the hearing its reasons for refusing to call a witness." *Ponte v. Real*, 471 U.S. 491, 496 (1985). It thus held that prison officials may wait until the inmate challenges the discipline on due process grounds to justify their refusal to call witnesses. *Id.* at 497 ("In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it 'later.'"). I see no reason why a request for discovery—which, unlike the right to call witnesses, is not even mentioned in the Supreme Court's case law—should be treated differently. Nor do I see any reason to treat materiality differently from other reasons a prison may have for denying an evidentiary request.

For this same reason, even if the hearing officer were constitutionally required to make this determination and failed to do so, that error would be harmless. *See Smith v. Dixon*, 14 F.3d 956, 975 (4th Cir. 1994) (noting that habeas petitions should be dismissed if the error was harmless). Despite the Majority's arguments, a silent film of the incident could not have meaningfully supported Lennear's defense.

40

As a final note, the Majority is correct that the Government never "offered any safety or correctional goal . . . justifying their decision to deny access to and review of the requested video surveillance evidence." *Ante* at 25 (cleaned up). We have held that *Wolff* requires prison officials to make such determinations on an "individual" basis, *Brown*, 373 F.3d at 505, and so we can only abstractly opine whether legitimate penological interests (such as inmate and staff safety, time and resource conservation, and a prison's interest in confidentiality) would justify the denial of a request for material surveillance footage. Had the Government offered individualized reasons in this case, they would not "be lightly second-guessed by courts far removed from the demands of prison administration." *Brown*, 373 F.3d at 505; *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987) (discussing "legitimate penological objectives"). But because such reasons were not offered here, the Majority's broad pronouncements about "overarching principles [] worthy of emphasis," *ante* at 17, are pure dictum. While those principles do go to the "scope of [inmates'] qualified rights" to video evidence, *id.* at 24, the Majority's analysis of this case turns only on the existence, not the scope, of such rights, *see id.* at 25–34. Those principles thus form no part of the "analytical foundations of the holding," *id.* at 24, but are simply scaffolding built to address hypothetical cases that have not yet come before us.

At base, this case is about the minimal constitutional requirements for prison disciplinary proceedings, not best practices. Recognizing the better practice, the Bureau of Prisons directs that "every effort" be made to "review and preserve" exculpatory video or audio surveillance where requested. *See* Dep't. of Justice, BOP, Program Statement 5270.09: Inmate Discipline Program 19 (July 8, 2011). But that directive is not a

41

constitutional floor.  In my view, the Constitution does not demand that prison officials go searching for apparently useless video evidence simply because an inmate makes that request.  For this reason, I respectfully dissent.