**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 24-6713**

─────────────

RAHSHJEEM BENSON,

       Petitioner – Appellant,

   v.

WARDEN FCI EDGEFIELD,

       Respondent – Appellee.

─────────────

Appeal from the United States District Court for the District of South Carolina, at Rock Hill.  Henry M. Herlong, Jr., Senior District Judge.  (0:24-cv-01195-HMH)

─────────────

Argued:  March 19, 2026                         Decided:  April 22, 2026

─────────────

Before KING, AGEE, and HARRIS, Circuit Judges.

─────────────

Vacated and remanded by published opinion.  Judge Agee wrote the opinion in which Judge King and Judge Harris joined.

─────────────

**ARGUED:**  Claire Victoria Madill, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.  Todd Stuart Timmons, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.  **ON BRIEF:**  James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.  Bryan P. Stirling, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

AGEE, Circuit Judge:

Rahshjeem Benson, a federal prisoner, was sentenced in December 2020. But he was not transferred to his designated Bureau of Prisons (BOP) facility—Federal Correctional Institution Edgefield (FCI Edgefield)—until March 2022. Prior to his arrival at FCI Edgefield, Benson alleges that he participated in First Step Act (FSA) programs and earned FSA credits which could expedite his pre-release custody or supervised release.

Once Benson arrived at FCI Edgefield, the BOP administered a risk and needs assessment to determine the FSA programs best suited for a prisoner based on his risk of recidivism. But because Benson did not receive the assessment until he arrived at FCI Edgefield, the BOP refused to give him any credits he alleges that he previously earned.

Benson filed a *pro se* habeas petition, requesting that the BOP award him the approximately 150 FSA credits he claims that he earned before arriving at FCI Edgefield. Without conducting discovery or requiring a response from the Government, a magistrate judge recommended dismissing his petition. The district court similarly declined to require a response from the Government, rejected Benson's objections to the magistrate judge's recommendation, and dismissed his petition.

For the reasons that follow, we vacate and remand for additional proceedings consistent with this opinion.

I.

A.

2

Before discussing the factual background and procedural history, a brief recitation of the relevant statutory framework is in order.

The FSA was designed to promote the release of federal prisoners who are less likely to recidivate and thereby reduce the federal prison population. *White v. Warden of Fed. Corr. Inst. – Cumberland*, 164 F.4th 326, 330 (4th Cir. 2025). Congress directed the Attorney General in the FSA to develop a "risk and needs assessment system" to be used by the BOP to (1) determine each prisoner's risk of recidivism and risk of violent or serious misconduct; (2) assign the prisoner to "appropriate evidence-based recidivism reduction [(EBRR)] programs or productive activities [(PAs)]"; and (3) assess when a prisoner is "ready to transfer into prerelease custody or supervised release." 18 U.S.C. § 3632(a). The FSA also tasks the BOP with providing "all prisoners with the opportunity to actively participate in [EBRR] programs or [PAs] . . . throughout their entire term of incarceration." *Id.* § 3621(h)(6).

Through participation in FSA programming, prisoners earn time credits that can be used to expedite pre-release custody or supervised release. Specifically, "[a] prisoner . . . who successfully completes [EBRR] programming or [PAs] . . . shall earn 10 days or time credits for every 30 days of successful participation." *Id.* § 3632(d)(4)(A). And if a prisoner is "at a minimum or low risk for recidivating" and "has not increased [his] risk of recidivism" "over 2 consecutive assessments," he "shall earn an additional 5 days of time credits for every 30 days of successful participation." *Id.*

The FSA does not define "successful participation." Instead, a BOP regulation provides that "successful participation" in programming "requires a determination by

3

[BOP] staff that an eligible inmate has participated in the EBRR programs or PAs that the [BOP] has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA." 28 C.F.R. § 523.41(c)(2).

## B.

In December 2020, Benson was sentenced in the District of Maine to 57 months' imprisonment in connection with various bank-fraud-related convictions. At that point, Benson was taken into custody at the Donald W. Wyatt Detention Center (Wyatt) in Rhode Island. However, his BOP-designated facility was FCI Edgefield.

Since Benson was facing other charges in the District of Massachusetts with a trial date set for March 2021, he remained at Wyatt and his transfer to FCI Edgefield was delayed.[1] The Massachusetts charges resulted in additional convictions and a 108-month prison sentence to run concurrent with the sentence imposed by the District of Maine. Relevant to the case now before us, Benson claims that he accrued approximately 150 days of time credits under the FSA during his time at Wyatt.

On March 30, 2022—nearly fifteen months after being taken into custody at Wyatt—Benson arrived at FCI Edgefield. On arrival, Benson received his FSA risk and needs assessment and was classified as having a "low" recidivism risk. FCI Edgefield did

---

[1] According to the Government, Benson was briefly removed from Wyatt at one point. But after his "counsel expressed concern over this," he was returned to Wyatt. Response Br. 9. Benson maintains that he was detained at Wyatt continuously following his arrest in 2019. For purposes of this appeal, this dispute is of no moment.

not, however, recognize the approximately 150 FSA credits Benson allegedly earned while at Wyatt.

Sometime after Benson's arrival, the BOP re-administered his risk and needs assessment. As a result, Benson's risk of recidivism was raised from "low" to "medium."[2]

When he filed the habeas petition in this case, Benson had accrued 220 days of BOP-approved FSA credits at FCI Edgefield. J.A. 19. His anticipated release date is November 22, 2027. Find an Inmate, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ [https://perma.cc/2WGE-TV8F] (last visited Mar. 24, 2026).

Benson filed multiple grievances at FCI Edgefield seeking recognition of the approximately 150 days of FSA time credits he allegedly earned at Wyatt, but all of those grievances were denied. Thereafter, Benson filed a *pro se* habeas petition under 28 U.S.C. § 2241, raising the same issue. Without seeking briefing, discovery, or hearing argument, the magistrate judge recommended dismissing Benson's petition. Benson filed objections.

The district court agreed with the magistrate judge, rejecting Benson's three objections and dismissing his petition without prejudice and without requiring the Government to respond. First, it rejected his argument that the magistrate judge "disregarded the plain language of the FSA in stating that he was not eligible to earn time credits until he arrived at FCI Edgefield." J.A. 37. Despite concluding that Benson was eligible to earn FSA credits as of December 15, 2020, the district court found "no evidence

---

[2] The Government moved to supplement the record with Benson's updated assessment, to which Benson objected. Because the updated assessment informs this Court's analysis, we grant the Government's motion and consider Benson's new assessment in evaluating this appeal.

5

in the record that he 'successfully participated' in any [FSA] programs . . . before he arrived at FCI Edgefield on March 30, 2022." J.A. 38. And consistent with the BOP's regulation defining "successful participation" as being linked to the completion of a prior risk and needs assessment, the district court held that Benson could not have earned FSA credits before his assessment on March 30, 2022.

Second, the district court rejected Benson's argument that the BOP's "regulation requiring that inmates undergo an initial risk and needs assessment before earning time credits is based on an impermissible construction of the FSA." J.A. 39. Applying *Chevron*[3] deference, the district court concluded that the BOP permissibly linked credits to the risk and needs assessment. Based on that interpretation, it reasoned that the BOP was not required to award credits for programming before its administration of an assessment.

Finally, the district court rejected Benson's argument that the BOP erred by failing to administer his risk and needs assessment sooner. It noted that Benson received his assessment the day that he arrived at FCI Edgefield, in line with BOP guidance.

Benson timely appealed, and this Court appointed the Federal Defender of the District of Maryland to represent him. The parties dispute whether this Court has Article III jurisdiction but, if it does, it has statutory jurisdiction under 28 U.S.C. § 1291.

II.

---

[3] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

On appeal, we are tasked with resolving two issues. First, the Government contends that this Court lacks Article III jurisdiction because Benson's "medium" recidivism risk assessment renders this controversy moot. If we have jurisdiction, then we may reach the second issue: whether the district court erroneously concluded Benson was ineligible to accrue FSA credits during his post-sentencing detention at Wyatt but before his risk and needs assessment at FCI Edgefield. We address each issue in turn below.

A.

Although the BOP initially categorized Benson as a "low" recidivism risk, upon re-administration of the risk and needs assessment, it assigned him a "medium" recidivism risk. The Government contends that the higher risk status stands as a statutory bar to Benson having his FSA credits applied, rendering this case moot. We disagree.

"[F]or a controversy to be moot, it must lack at least one of the three required elements of Article III standing: (1) injury in fact, (2) causation, or (3) redressability." *Townes v. Jarvis*, 577 F.3d 543, 546–47 (4th Cir. 2009). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States v. Ketter*, 908 F.3d 61, 65 (4th Cir. 2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Mootness is difficult to prove, though, as "[a] case becomes moot only when it is *impossible* for a court to grant *any* effectual relief whatever to the prevailing party." *Id.* (citation omitted).

Under the FSA, a prisoner's recidivism determination is not static; Congress directed the BOP to administer "periodic risk reassessments." *Id.* § 3624(g)(1)(B). As a

7

prisoner's risk of recidivism ebbs and flows with each reassessment, so too does his eligibility for expedited pre-release custody or supervised release. To that end, to be eligible for pre-release custody based only on a risk of recidivism, a prisoner must be at "a minimum or low risk to recidivate pursuant to [his] last 2 reassessments." *Id.* § 3624(g)(1)(D). Still, prisoners with "medium" or "high" risks of recidivism are not left empty-handed. The FSA permits those prisoners to "petition to be transferred to prerelease custody or supervised release [upon] approv[al] by the warden of the prison," based on certain statutorily-prescribed determinations. *Id.* § 3724(g)(1)(D)(i)(II).

Here, upon his arrival at FCI Edgefield, Benson received a "low" recidivism risk. But the BOP subsequently re-administered the risk and needs assessment and found that he was a "medium" recidivism risk, placing him outside the reach of certain provisions of the FSA. *See id.* § 3624(g)(1)(D). As a result, the Government argues that Benson is up a creek without a paddle because, even if we grant his habeas petition, his situation does not change. He remains a "medium" risk of recidivism and thus ineligible for expedited pre-release custody or supervised release.

On the surface, this argument has some appeal. A favorable determination in the risk and needs assessment essentially permits Benson to open a locked door to applying his FSA credits—and it is within the BOP's purview, not ours, to give him the key. However, the Government overlooks key provisions of the FSA and misapplies this Court's precedent in advancing its mootness argument.

Looking to the FSA, prisoners at "medium" or "high" risks of recidivism are not deprived of all opportunities to apply FSA credits. As noted earlier, a prisoner is eligible

8

for pre-release custody or supervised release if, *inter alia*, he "has shown through the periodic risk assessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during [his] term of imprisonment." 18 U.S.C. § 3624(g)(1)(B). But a prisoner is *also* eligible if he (1) "has been determined . . . to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner;" *or* (2) "has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison, after the warden's determination that" he (a) "would not be a danger to society if transferred to prerelease custody or supervised release;" (b) "has made a good faith effort to lower [his] recidivism risk through participation in recidivism reduction programs or [PAs];" and (c) "is unlikely to recidivate." *Id.* § 3642(g)(1)(D)(i); *see id.* § 3642(g)(1)(D)(ii).

In other words, the FSA does not squarely foreclose a prisoner's eligibility for prerelease custody or supervised release based on a single determination that he has a "medium" risk of recidivism. To be sure, it *limits* that prisoner's options, but it leaves two paths to eligibility (albeit narrower paths than prisoners with uninterrupted records of "minimum" or "low" risk assessments): (1) two subsequent reassessments of "low" risk; or (2) the warden's approval of the prisoner's petition.

Under our precedent, Benson's statutorily-prescribed paths to FSA eligibility for prerelease custody or supervised release are sufficient to establish Article III jurisdiction. This Court has recognized that, "[i]n some cases, like the one at hand, a plaintiff will seek *immediate* relief from a federal court as a necessary antecedent to the *ultimate* relief he seeks from a different entity, like an administrative agency." *Townes*, 577 F.3d at 547. But

9

that dynamic does not, in and of itself, deprive this Court of jurisdiction. Instead, to establish redressability in such situations, "a party must demonstrate that a favorable decision from the federal court likely would provide him immediate relief, but need not demonstrate that it likely would provide him the ultimate, discretionary relief sought from the agency." *Id.* To require otherwise "would involve courts in the speculative (if not impossible) task of predicting how an agency will exercise its discretion." *Id.* at 548.

In the case before us, if Benson were to prevail on his claims, he could access a metaphorical "bank" of approximately 150 days of FSA credits. True, these credits would only become available to him upon the BOP's exercise of its discretion—either through two consecutive determinations that he is a "low" risk of recidivism, 18 U.S.C. § 3632(d)(4)(A), or through the warden's approval of Benson's petition to be transferred to prerelease custody or supervised release, *id.* § 3724(g)(1)(D)(i)(II). We cannot know now how the BOP will choose to exercise its discretion, but that isn't the point of decision for our jurisdictional analysis as it relates to mootness. What counts is that under the FSA, the agency *could* grant Benson access to his alleged "bank" of credits *if* we clear the path by first addressing Benson's argument on appeal.

In other words, "if [Benson] prevails on the merits before us, he likely will obtain the *immediate* relief he seeks," i.e., the opportunity to access his pre-assessment credits upon the agency's favorable exercise of discretion. *Townes*, 577 F.3d at 549. So while "we refuse to speculate as to how [the BOP] w[ill] exercise its discretion," we conclude that Benson "has set forth facts sufficient to demonstrate that his claims are not moot, and we accordingly turn to the merits of his appeal." *Id.*

10

B.

Benson contends that the BOP's interpretation of "successful participation" is inconsistent with the FSA and is therefore not entitled to deference under *Chevron*, which the Supreme Court overturned in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). We vacate and remand for the district court to decide in the first instance whether the BOP's interpretation survives scrutiny under *Loper Bright*.

As a threshold issue, the Government attempts an end-run around the *Chevron* issue, arguing that this Court may affirm the dismissal of Benson's petition because he failed to adequately plead participation in FSA programs before he arrived at FCI Edgefield. But "[p]ro se filings are to be construed liberally." *Sanford v. Clarke*, 52 F.4th 582, 587 (4th Cir. 2022). And in his *pro se* habeas petition, Benson alleged that he "availed himself admirably of the [PAs] which were made available to him" during his time at Wyatt. J.A. 10–11. We also note that, after the magistrate judge recommended dismissing his petition based on his failure to allege adequate participation, Benson objected. He explained that, "[w]hen he was transferred between facilities he had property go missing, including his completion certificates for rehabilitation programs he completed." J.A. 33. Further, Benson explained that "there is testimony in his court transcripts that he 'had at least 20 completions of different programs that he's engaged in on his own,'" and he asked the district court to "request his educational transcripts from his federal holding facility to determine how many additional days he may be entitled to." *Id.* He noted that he had made such a request, "but ha[d] not yet received a response." *Id.*

11

A review of the district court's opinion reveals that it did not engage with—let alone rely on—this argument. It dismissed Benson's petition because he did not *successfully* participate in FSA programs as defined in the BOP's regulations—not that he failed to plead participation altogether. And notably, it did so without permitting any discovery or requiring a response from the Government. The record is thus critically under-developed on the issue of whether Benson actually participated in FSA programs prior to arriving at FCI Edgefield.

Given our liberal construction of *pro se* pleadings and the district court's failure to develop the record or address this argument, we decline to affirm on this ground. *See McNair v. McCune*, 527 F.2d 874, 875 (4th Cir. 1975) ("Because the facts have not been ascertained, we are compelled to assume the truth of the complaint, and because it was prepared pro se, to construe it liberally.").

Having dispensed with the Government's pleading deficiency argument, we are left with the district court's conclusion that, applying *Chevron* deference, the BOP's implementation of its "successful participation" regulation was a valid exercise of delegated authority. The trouble, of course, is that *Chevron* was overturned in *Loper Bright*, 603 U.S. 369. In the wake of *Loper Bright*, federal courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 413. Instead, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id*. "Courts 'fulfill[] that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those

12

boundaries." *United States v. Kokinda*, 146 F.4th 405, 417 (4th Cir. 2025) (quoting *Loper Bright*, 603 U.S. at 395). The goal of this inquiry is to ensure that agencies are adhering to the "single, best meaning" of a statute. *Loper Bright*, 603 U.S. at 400.

While we recognize the district court did not have the benefit of *Loper Bright* at the time of its decision, it must be applied now. Accordingly, we remand for the district court to address the *Loper Bright* issue in the first instance. We briefly discuss some guiding principles for purposes of remand.

Turning to the text, the FSA provides: "A prisoner may not earn time credits under this paragraph for an [EBRR] program that the prisoner successfully completed . . . prior to the date of enactment of this subchapter; or . . . during official detention prior to the date that the prisoner's sentence commences under section 3585(a)." 18 U.S.C. § 3632(d)(4)(B). Section 3585(a), in turn, explains that a sentence "*commences* on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served." *Id.* § 3585(a) (emphasis added).

The FSA also provides that a prisoner "who successfully completes [EBRR] programming or [PAs] . . . shall earn 10 days or time credits for every 30 days of successful participation." *Id.* § 3632(d)(4)(A). What the FSA does not provide, however, is a definition of "successful participation." The BOP stepped into that void, defining "successful participation" as "requir[ing] a determination by [BOP] staff that an eligible inmate has participated in the EBRR programs or PAs that the [BOP] has recommended *based on the inmate's individualized risk and needs assessment*, and has complied with the

13

requirements of each particular EBRR Program or PA." 28 C.F.R. § 523.41(c)(2) (emphasis added). The BOP has, in practice, interpreted that definition as requiring that prisoners complete a risk and needs assessment *before* being eligible to earn FSA credits.

In line with the FSA's definition of "commence," we conclude that the district court correctly found Benson's sentence commenced when he was taken into custody of the U.S. Marshals Service on December 15, 2020. J.A. 37–38. Critically, the FSA does not hinge the commencement of a prisoner's sentence on his *arrival* to his BOP-designated facility. Therefore, Benson's ability to "earn time credits" is not tied to his arrival at FCI Edgefield. *See* 18 U.S.C. § 3632(d)(4)(B)(ii). As a result, the fact that Benson did not arrive at his designated facility, FCI Edgefield, until March 2022 is irrelevant to the commencement of his sentence for FSA purposes. So under the FSA, Benson was eligible to participate in FSA programs as of December 2020, and he alleges he did exactly that. Yet the BOP declined to recognize any credits Benson allegedly earned before his arrival at FCI Edgefield because the BOP's definition of "successful participation" requires an individualized risk and needs assessment as a condition precedent to any participation. While that regulation may make some practical sense, the statutory requirement as to when a sentence "commences" is mandatory.

In short, Congress decided that a prisoner is eligible to earn credits when his sentence commences. 18 U.S.C. § 3632(d)(4)(B). Despite that clear commend, it appears that the BOP's interpretation of "successful participation" permits it to ignore FSA time credits earned after a prisoner's sentence commences but before the BOP's own administration of an assessment. Insomuch as that interpretation is not due the now-

14

discarded *Chevron* deference, we leave it to the district court to flesh out in the first instance whether it is the "single, best meaning" of the FSA. *Loper Bright*, 603 U.S. at 400.[4]

We now briefly address the Government's additional argument that *White v. Warden of Federal Correctional Institution – Cumberland*, 164 F.4th 326 (4th Cir. 2025), resolved this issue. In *White,* the plaintiff, a federal prisoner, sought FSA credits based on the BOP's failure to provide him with programming during a three-day period while he was housed in a federal transfer center. *Id.* at 328. But the Court's resolution of that issue does not resolve the issue presented in this appeal.

In *White*, the Court conducted a *Loper Bright* analysis and concluded that "*under the best reading* of the FSA, the district court correctly ruled that White is not entitled to FSA time credits for his three-day transitory stay in the [federal transfer center], where no FSA programming was offered and where there is no evidence that White even requested such programming while there." *Id.* at 330. We emphasized that "[i]n this case, the record does not demonstrate, nor does it at all suggest, that White participated in or completed any programming to earn credits during his three days in [the federal facility] while transferring from FCI Terre Haute to FCI Cumberland." *Id.* at 331. That was fatal to White's claim because "[t]he statute is plain; it requires *participation* for *credits*." *Id.* "For White, it [was]

---

[4] On remand, the Government requested that the Court instruct the district court to consider whether it retains jurisdiction given that Benson has allegedly been transferred to a federal detention facility outside of the District of South Carolina. We decline to do so. "When the 'Government moves a habeas petitioner after [he] properly files a petition naming [his] immediate custodian, the District Court [where the petitioner filed a petition] retains jurisdiction.'" *Lennear v. Wilson*, 937 F.3d 257, 263 n.1 (4th Cir. 2019) (alteration in original) (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004)).

15

not a question of whether he *successfully* participated; it [was] a question of whether he participated *at all*, and the record show[ed] that he did not." *Id.* at 333.

By contrast, Benson's successful participation for FSA purposes is the issue here and that has yet to be resolved. As explained above, the factual record is in far too nascent a stage to dismiss on the ground that Benson did not, in fact, participate in FSA programs during his time at Wyatt. Thus, the Court's holding that White's failure to actually participate in FSA programs meant he was not entitled to FSA credits does not control this appeal.[5]

For all the reasons set forth above, we vacate and remand this case for the district court to address in the first instance whether the BOP's interpretation of "successful participation" reflects the "single, best meaning" of the FSA.[6, 7] *Loper Bright*, 603 U.S. 400.

---

[5] In *White*, the Court also held that federal prisoners do not have a liberty interest in FSA time credits. 164 F.4th at 333–35. That holding similarly has no bearing on the issue of whether Benson successfully participated in programming, as required by the FSA.

[6] If the district court concludes that the BOP's interpretation is inconsistent with the FSA, this case raises a panoply of other questions. For instance, additional factfinding would be necessary to determine how many credits Benson actually earned during his time at Wyatt. In addition, the district court would need to determine whether Benson is entitled to all of his FSA time credits earned during his time at Wyatt, or if he is only entitled to credits that comport with his risk assessment at the time of his arrival at FCI Edgefield.

These are important, fact-intensive questions. That said, Benson is scheduled to be released in November 2027 and, if he receives a favorable decision, could be eligible for pre-release custody and supervised release earlier than that. Therefore, to the extent practicable, we encourage the district court to act with the utmost expediency.

[7] Because we vacate and remand for the district court to consider this issue in light of *Loper Bright*, we do not address Benson's argument that the delay in his transfer to FCI Edgefield independently warrants receipt of any additional FSA credits.

## III.

The judgment of the district court is therefore vacated and remanded for additional proceedings consistent with this opinion.

*VACATED AND REMANDED*